IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

**ROBERT SIMON, JR.**                                                                    **PETITIONER**

v.                            **No.: 2:11-CV-111-SA**

**CHRISTOPHER EPPS, ET AL.**                                     **RESPONDENTS**

**MEMORANDUM OPINION AND ORDER**

Petitioner Robert Simon, Jr., is a death-row inmate scheduled for execution on May 24, 2011, at 6:00 p.m. Petitioner has filed with this Court a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing that his execution would violate the Eighth and Fourteenth Amendments to the United States Constitution, as he is presently incompetent to be executed under the standards enunciated in *Ford v. Wainwright* and *Panetti v. Quarterman*. *See, e.g., Ford*, 477 U.S. 399, 410 (1986) (holding that the execution of an incompetent or insane prisoner violates the Constitution); *Panetti*, 551 U.S. 930, 934 (2007). He requests that the Court stay his execution to allow his petition to proceed, and that expert funds be authorized to allow him to present evidence of his claim of incompetency at an evidentiary hearing. After reviewing the arguments and evidence in support of the parties' respective positions, the Court finds that all of Petitioner's requested relief should be **DENIED** for the reasons set forth below.

**Facts and Procedural History**

On February 2, 1990, Robert Simon, Jr. and an accomplice robbed and murdered the Parker family at their home in Marks, Mississippi. Petitioner was sentenced to death for three of the murders. After his attempts to obtain State court relief failed, he filed for federal habeas relief,

1

which was denied by this Court and the Fifth Circuit Court of Appeals. *See, e.g., Simon v. Epps*, No. 08-70011, 394 Fed.Appx. 138 (5th Cir. September 7, 2010) (unpublished). The United States Supreme Court denied a writ of certiorari on March 21, 2011, and on the same date, the Attorney General filed a motion requesting that an execution date be set. *See Simon v. Epps*, 131 S.Ct. 1677 (2011). On March 29, 2011, Petitioner field a response to the motion alleging that a head injury he received on or about January 7, 2011 renders him incompetent to be executed. He also subsequently filed a petition for post-conviction relief with the Mississippi Supreme Court on the basis of his alleged incompetency.

On April 7, 2011, the Mississippi Supreme Court ordered that the Petitioner's medical records be produced, ordered the Attorney General to file a response to the motion, held all rulings in abeyance, and ordered that it would accept no additional filings in the case after 5:00 p.m. on April 21, 2011. The parties submitted briefs, exhibits, and affidavits in support of their respective pleadings, with Respondents submitting their response to the application for post-conviction relief on April 21, 2011. On May 5, 2011, the court rendered its decision on the basis of the record evidence, denying Petitioner's requests and issuing a warrant that set his execution date for May 24, 2011. Petitioner has now filed for federal habeas relief, arguing that he raised a prima facie claim of incompetency in State court, and that the court's refusal to order an evaluation on his claim that he is incompetent to be executed violates his rights to due process, meaningful access to the courts, his right to the adequate assistance of counsel, and the right to be free from cruel and unusual punishment.

## Jurisdiction

Petitioner's application is governed by the Anti-Terrorism and Death Penalty Act of 1996 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). Because Petitioner has previously filed for relief in this Court, he would ordinarily have to seek permission from the Fifth Circuit Court of Appeals prior to filing a second petition in this Court. *See* 28 U.S.C. § 2244(b)(3)(A) ("Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application."). However, the prohibition against a second petition that is unauthorized is not applicable where Petitioner's claim was not ripe in the first application. *See Panetti*, 550 U.S. at 945 (holding that Congress did not intend for the "second or successive" provisions in the AEDPA to apply to applications "raising a *Ford*-based incompetency claim filed as soon as that claim is ripe"). Therefore, the instant petition is not successive within the meaning of the governing statute and the Court may properly consider it.

## Proof Presented

Petitioner submits hospital infirmary records maintained by the Mississippi Department of Corrections ("MDOC") substantiating that he was twice admitted to the infirmary on January 7, 2011, and he alleges that a head injury of unknown origin preempted the trip to the infirmary. The records demonstrate that on the first admission, which occurred around 5:45 a.m. on January 7, 2011, Petitioner had bruising on his face, exhibited "word salad," stated that he did not understand English, and was largely nonverbal with the staff. The records indicate that he was released from the infirmary at 8:40 a.m. that morning and returned to his unit. A second admission was noted at around 11:00 a.m. the same morning, with a staff notation that Petitioner was unresponsive and had

suffered an apparent loss of consciousness. The staff notes later indicate that he was confused and lacked memory as to what had happened. His admitting diagnosis included an "altered neurological function." During his stay, the staff notes indicate that he continued to have memory problems, which prevented him from remembering names, people, places, etc., and that he began engaging in altered communication patterns, such as referring to himself as "me" where "I" would be appropriate. Petitioner remained in the infirmary for several days and was released on or about January 10, 2011, with a diagnosis of hypertension. At the time of his release, staff notes indicate that he was in a stable, oriented condition. (*See* Pet. Ex. D, MDOC medical records).

Affidavits from habeas counsel Mr. Freeland indicate that he first became aware that Petitioner might suffer a neurological problem when another prisoner wrote to Mr. Freeland and informed him that Petitioner had fallen and was exhibiting strange behavior. (*See* Pet. Ex. A, Freeland Aff., March 29, 2011). When Mr. Freeland and his associate, Ms. Jenkins, visited Petitioner on March 16, 2011, they allege that he appeared not to know Mr. Freeland, not to recall the names of his family members or medications, and not to understand that the attorneys were not meeting with him to get him out of prison, but rather, to stop the State of Mississippi from carrying out his execution. (*See id.*; Pet. Ex. B, Aff. of Forrest A, Jenkins, March 28, 2011). Habeas counsel indicates that Petitioner became uncommunicative and distraught after learning of the reason for their visit, and that he called the guard and ended the meeting. (*See id.*).

At the request of counsel, clinical neuropsychologist John R. Goff reviewed Petitioner's medical records and the affidavits submitted by habeas counsel. (Pet. Ex. G, Aff. of John R. Goff, April 19, 2011). He opines that the records "strongly suggest[] the occurrence of a significant neuropsychological event on 07 January 2011" and that the follow-up by MDOC staff is not

4

sufficient to determine whether the "neuropsychological defect" demonstrated by Petitioner is substantially interfering with his factual comprehension of his sentence and/or fate. (*Id.*). He states that a neuropsychological evaluation is necessary to reach a definitive conclusion, and that interviews conducted with Petitioner to this point are insufficient to make a valid conclusion about his current understanding. (*See id*).

Respondents maintain that the MDOC records do not record that Petitioner was admitted to the infirmary because of a head injury, and they argue that the affidavits from the staff at the infirmary dispel Petitioner's claim that he is incompetent or insane. On the day that the Attorney General moved to have an execution date set, the prison superintendent asked Dr. Barry Beaven to examine Petitioner. (*See* Pet. Ex. H, Aff. of Barry Beaven, April 8, 2011). Dr. Beaven notes that Petitioner could not remember the names of everyday items, the current President, or any of his personal identifying information. (*See id.*). Respondents assert that Dr. Beaven's notes also demonstrate, however, that despite his apparent confusion, Petitioner knew his clothing size had been changed and he inquired as to the arrival date of his new television. (*See* R. Ex. F, 97-98).[1]
 In a staff note, Dr. Beaven records that Petitioner has "apparent memory about things he wanted" and that "[d]irect questioning [of Petitioner] made all responses invalid." (*See id.*). Dr. Kim Nagel, a psychiatrist at MDOC, states that he examined Petitioner following Petitioner's allegations that he had suffered a head trauma and found that Petitioner communicated with him normally and in English. (*See, e.g.*, Pet. Ex. E, Aff. of Kim Nagel, April 8, 2011). Dr. Nagel also notes that

---

[1] The exhibit marker on the records is actually "E," although the medical records are referred to as Exhibit F in the Answer. Due to the mislabeling, several of Respondents' exhibits as labeled do not match the lettering of the exhibits as filed. Therefore, where both parties have filed the same affidavit, the Court refers solely to the filing as designated by Petitioner to avoid confusion.

Petitioner asked to be moved from the suicide precaution cell that he was in, and in a subsequent interview, Petitioner informed the doctor that although he referred to himself as "me" instead of "I," the two meant the same thing. (*See id.*). Dr. Nagel notes that Petitioner conversed normally with another inmate during the visit, and he opines that Petitioner is "sufficiently competent in his mental functions to understand his situation." (*See id.*). In a second affidavit, Dr. Nagel states that Petitioner did not appear to exhibit memory loss during their conversations, and that he has never known of a patient to suffer a contemporaneous loss of "long-term, mid-term, and short-term memory." (R. Ex. C. Aff. of Kim Nagel, April 11, 2011).

In an undated sworn declaration attached by Petitioner and Respondents, Dr. William Cartier, a psychologist who met with Petitioner at his cell on April 8, 2011, found him to be able to carry on normal conversations, saw him speak to the prison Chaplain, and observed him to be "jovial and conversant." (Pet. Ex. I, Aff. of William Cartier; R. Ex. D (same)). Dr. Cartier states that Petitioner complied with the doctor's request for Petitioner write his ID number and name on an envelope. (*See id.*). Finally, Respondents argue that the notes from the infirmary demonstrate that Petitioner was alert, oriented, stable, and was suffering no distress or complaints at the time of his discharge on January 10, 2011. (*See, e.g.*, Pet. Ex. D; R. Ex. F, 57-59, 64).

**Applicable Standards**

Because the Mississippi Supreme Court adjudicated Petitioner's claims on the merits, Petitioner is not entitled to relief on his claims unless he demonstrates that the State court's adjudication of his claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination

6

of facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 413 (2000).

A prisoner's execution is constitutionally prohibited where his "mental illness prevents him from comprehending the reasons for the penalty or its implications." *Ford*, 477 U.S. at 417. In *Panetti,* the Supreme Court found that the petitioner must additionally have "a rational understanding" of the reason for his execution. *Panetti*, 551 U.S. at 959-960; *see also Billiot v. Epps*, 671 F.Supp.2d 840, 853 (S.D. Miss. November 3, 2009) (framing the competency to be executed issue as "whether the defendant has a rational understanding of his conviction, his impending execution, and the relationship between the two."). *Ford* left it to the states to determine how appropriately restrict death sentences of incompetent/insane prisoners, and it gave them significant latitude in developing the means necessary to do so. *See* 477 U.S. at 416-17. Mississippi's supervening insanity statute provides that a person "has become mentally ill" and is not subject to execution if he is found by the court to lack "sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate that awaits him, and a sufficient understanding to know any fact that might exist that would make his punishment unjust or unlawful and the intelligence requisite to convey that information to his attorneys or the court." Miss. Code Ann. § 99-19-57(2)(a)&(b). Mississippi has determined that a prisoner seeking to stop his execution pursuant to *Ford* bears the burden to establish with a reasonable probability that he is presently insane. *Billiot v. State*, 478 So.2d 1043, 1045 (Miss. 1985). If a prisoner makes a "substantial threshold showing of insanity," due process entitles him to a delay of his execution to allow a "fair hearing," which includes an opportunity to submit evidence, make arguments, and obtain expert psychiatric assistance. *See Ford,* 477 U.S. at

7

426; *Panetti*, 551 U.S. at 934-35, 949.

While this Court has the authority to stay Petitioner's execution under 28 U.S.C. § 2251, it must not grant a stay without considering "(1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest." *Buxton v. Collins*, 925 F.2d 816, 819 (5th Cir. 1991) (citation omitted). The Court must make this determination with an awareness that its consideration must "be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). The Court's deliberation also acknowledges that Petitioner's claim has been adjudicated on the merits in State court. Therefore, whether Petitioner can show a likelihood of success on the merits of his claim must necessarily include a consideration of whether he can meet the standards of § 2254(d).

## State Court Decision & Present Arguments

After noting the pleading requirements and reciting the standard for obtaining leave to proceed in the trial court under Mississippi's post-conviction relief statute, the Mississippi Supreme Court found that "the allegations contained in [Petitioner's] motion fail to present a substantial showing of the denial of a state or federal right" as required to allow him to proceed on an application for post-conviction relief. (Pet. Ex. J, "En Banc Order," May 5, 2011). The court held that, based on its review of all the documentation submitted, Petitioner "failed to make a substantial threshold showing of insanity/mental illness" and denied the motion for leave to proceed in the trial court on the petition for post-conviction relief. (*See id.*).

8

Petitioner argues that he made a substantial threshold showing to the Mississippi Supreme Court that he is incompetent to be executed, and that the court's refusal to allow him an examination or an opportunity to respond to the State's responsive filing precludes a finding that the Mississippi Supreme Court's procedure afforded him due process. Respondents maintain that Petitioner's evidence fails to establish a prima facie case sufficient to allow Petitioner's claims to proceed any further, and they argue that he has failed to demonstrate the substantial threshold necessary to demonstrate that the Mississippi Supreme Court's decision was based upon an unreasonable application of *Ford* or *Panetti*.

**Application**

Petitioner has not demonstrated that it was unreasonable for Mississippi Supreme Court to determine that he failed to make a "substantial threshold showing of insanity" that would entitle him to additional process under *Ford* and *Panetti*. The information contained in Dr. Goff's affidavit is of the type the Mississippi Supreme Court has previously held to be insufficient proof to establish a reasonable probability of present insanity. *See, e.g., Johnson v. Cabana*, 818 F.2d 333, 339-40 (5th Cir. 1987) (holding that doctor's affidavit that defendant's condition "'may' impair his relations with his counsel" fails to "come close to establishing" that he suffers a supervening insanity that would render his execution unconstitutional). In *Johnson*, the Fifth Circuit rejected a prisoner's challenge to the Mississippi Supreme Court's determination that he had failed to present sufficient evidence to warrant a hearing under the statute governing supervening insanity where the State court received into evidence affidavits, briefs, and lay and expert evidence. *See id.* at 340. It found the process "suitable to the exigencies created" by the petition, and held that "[t]he threshold question was one that called for the exercise of basically subjective judgment which had to depend upon

9

expert analyses in a discipline fraught with subtleties and nuances. Given the situation in this case, ordinary adversarial procedures would not have provided any better means of arriving at a sound, dependable judgment as to whether Johnson had made a prima facie or 'substantial threshold' showing since the date of his trial he had become insane[.]" *Id.*

In accordance with the post-conviction statute, the Mississippi Supreme Court allowed Petitioner to file pleadings, required a response from the Attorney General, ordered his medical records produced, and denied the application only after finding that Petitioner failed to "present a substantial showing of the denial of a state or federal right." *See, e.g.,* Miss. Code Ann. § 99-39-9 and § 99-39-27(5) (applications must "present a substantial showing of the denial of a state or federal right" or the court may deny the application). *Ford*'s guarantee of procedural due process recognizes that a "fair hearing" is an "opportunity to be heard." *Ford,* 477 U.S. at 424; *Panetti*, 551 U.S. at 949. Regardless of whether it is framed as such, Petitioner argues that the standards in *Panetti* and *Ford* entitle him to a defense expert in order to make a substantial threshold showing of insanity. They do not. It is Petitioner's burden to initially come forward with sufficient proof to trigger the additional safeguards. *See, e.g., Ford,* 477 U.S. at 426 (finding that states "may require a substantial threshold showing of insanity merely to trigger the hearing process" that would entitle the prisoner to a defense expert); *see also Billiot v. State*, 478 So.2d 1043, 1045 (Miss. 1985) (holding that a prisoner seeking to stop his execution pursuant to *Ford* bears the burden to establish with a reasonable probability that he is presently insane).

Petitioner has been examined or interviewed several times since he was admitted to the infirmary in January 2011. Many documents filed in this case were created contemporaneously with or directly in follow-up to Petitioner's allegation of injury, and much of the information is

contradictory. Some information suggests that Petitioner suffers confusion, memory loss, and that he seems to have regressed in his ability to communicate and care for himself. Other information suggests that Petitioner's memory is intact, his communication skills are normal, and that there is no reason to believe that he is not sufficiently grounded in reality. Petitioner argues extensively in his pleadings that he could not present more evidence because his motion to have Dr. Goff evaluate Petitioner was denied. However, both parties have submitted the bulk of their arguments from the same set of medical records, and it has not been demonstrated unreasonable to determine that there is no "substantial threshold showing" in those records that Petitioner is currently unaware that he is on death row, that he is unaware that he is scheduled to be executed, or that he lacks an actual understanding of the fact that he is to be executed because he was lawfully sentenced to death for the capital murder of three individuals. That Petitioner became distraught when informed by counsel that he would not be getting out of prison, but that he would likely be executed unless counsel could somehow stop the process, is just as likely explained as an understandable reaction to distressing news as it is a mental illness. Petitioner has not demonstrated that it contrary to, or involving an unreasonable application of, the due process requirements found in *Ford* and *Panetti* to determine that the procedure afforded Petitioner was adequate given the evidence Petitioner submitted to the court. The Mississippi Supreme Court's decision on the basis of Petitioner's evidence, made only after the court reviewed evidence in support of Petitioner's argument, is not one "so lacking in justification" such that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 786-87 (2011). Therefore, federal habeas relief is precluded on Petitioner's claims, and Petitioner's motion to stay his execution denied.

**Certificate of Appealability**

This Court must issue or deny a COA upon its entry of an order adverse to Petitioner. *See* Rule 11 of the Rules Governing § 2254 Cases; *see also* 28 U.S.C. § 2253(c)(1). A COA will not issue unless Petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which Petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petitioner's claim has been denied on procedural grounds, Petitioner must additionally demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. The Court, resolving in Petitioner's favor any doubt as to whether a COA should issue, determines that Petitioner is entitled to a COA on his claim that he is presently incompetent to be executed, as well as his claim that his procedural due process rights were denied by the Mississippi Supreme Court's resolution of his claim.

**Conclusion**

Petitioner has not shown that the State court's decision is contrary to, or involves an unreasonable application of, clearly established federal law as set forth in *Ford* and *Panetti*, nor has he shown that the decision was based on any unreasonable factual determinations in light of the evidence presented to it. He has additionally failed to make a sufficient threshold showing that he is incompetent to be executed and is not entitled to a stay of execution. Therefore, the Court **ORDERS** that:

1. The relief requested in the instant petition for writ of habeas corpus is **DENIED** and the petition is **DISMISSED** with prejudice.

2. Petitioner's motion for a stay of execution is **DENIED**.

3. Petitioner's motion for authorization for expert funding is **DENIED**.

4. All other pending motions are **DISMISSED AS MOOT**.

5. A COA is **GRANTED** on Petitioner's substantive claim and procedural claim.

6. A final judgment in accordance with this Order shall issue today.

    **SO ORDERED**, this the 20th of May, 2011.

                                      **/s/ Sharion Aycock**
                                      **UNITED STATES DISTRICT JUDGE**