**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

**ROBERT SIMON, JR.,**                                                        **PETITIONER**

**v.**                                                   **CIVIL ACTION NO.: 2:11-CV-111-SA**

**RICK MCCARTY[1] and**
**JIM HOOD,**                                                          **RESPONDENTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Petitioner Robert Simon, Jr., a death-row inmate in the custody of the Mississippi

Department of Corrections, has filed a petition, as amended, for writ of habeas corpus pursuant to

28 U.S.C. § 2254 challenging his competence to be executed under the standards as set forth in

*Ford v. Wainwright*, 477 U.S. 399 (1986) and *Panetti v. Quarterman*, 551 U.S. 930 (2007).

Having held an evidentiary hearing in this cause where the Court heard witness testimony and

reviewed exhibits, and having considered the parties' pleadings and the applicable law, the Court

concludes that the instant petition should be denied, for the reasons that follow.

### I. Procedural History[2]

In 1990, Robert Simon, Jr., was convicted and sentenced to death for the murder of three

family members in Marks, Mississippi. By 2011, Simon had exhausted State and Federal

---

[1] The Court takes judicial notice that Ricky McCarty is the current Interim Commissioner of the Mississippi Department of Corrections, having replaced former Commissioner Christopher Epps.

[2] The facts underlying Simon's convictions and sentences were laid out in the Court's Memorandum Opinion and Order denying Simon's initial petition for a writ of habeas corpus. *See Simon v. Epps*, No. 2:04cv26-P-B, 2007 WL 4292498 (N.D. Miss. Nov. 30, 2007).

avenues to review his convictions and death sentences. On March 21, 2011, the State of Mississippi filed a motion to set an execution date for Simon. Approximately one week later, on March 29, 2011, Simon filed a response to the State's motion alleging that he received a head injury on or about January 7, 2011, that renders him incompetent to be executed. A few days later, Simon filed with the Mississippi Supreme Court a motion for leave to proceed in the trial court on a petition for post-conviction relief to determine his competency to be executed. He also requested resources to secure an expert evaluation. On May 5, 2011, the Mississippi Supreme Court denied Simon's motion, and it granted the State's motion to set an execution date. Simon's execution was set for May 24, 2011.

On May 13, 2011, Simon filed a federal habeas petition and motion to stay his execution on the ground that he is presently incompetent to be executed under the standards set forth in *Ford v. Wainwright* 477 U.S. 399 (1986) and *Panetti v. Quarterman*. U.S. 930 (2007).[3] On May 20, 2011, this Court denied Simon's motion to stay and dismissed his petition for writ of habeas corpus, but it granted a Certificate of Appealability on Simon's substantive claim, as well as his claim that his due process rights were violated by the Mississippi Supreme Court's refusal to grant an evidentiary hearing where his competency could be assessed. On May 24, 2011, the date of his scheduled execution, the Fifth Circuit Court of Appeals granted Simon's motion to stay his execution in order to consider his appeal. On March 1, 2012, the Fifth Circuit reversed the denial of the petition and remanded the case for further proceedings, finding that the procedures

---

[3] Because Simon's claim was not ripe in his first petition, the instant application is not deemed a "second or successive" petition. *See Panetti*, 551 U.S. at 945 (holding that Congress did not intend for the bar against "second or successive" to apply to claims "raising a *Ford*-based incompetency claim filed as soon as that claim is ripe").

employed failed to provide Simon a fair hearing on the issue of his competence to be executed. *Simon v. Epps*, No. 11-70015, 463 F. App'x 339, 347 (5th Cir. 2012) (holding "that the procedures in this case, which allowed the State to present expert evaluations while Simon was prevented from presenting countervailing expert evaluations, violated fundamental fairness and due process").

On May 23, 2012, this Court, *sua sponte*, entered an order setting deadlines and authorizing Simon funds to retain the services of Dr. John Goff[4], a clinical psychologist and neuropsychologist, to investigate Simon's *Ford/Panetti* claim. (*See* ECF No. 21). The Court set a deadline for Simon to file an amended petition on or before August 17, 2012, and it ordered Simon to attach to his amended petition a report prepared by his expert that specifically addressed "the expert's opinion as to Simon's present competency to be executed." (*See id.*). The Court subsequently granted Respondents' request to have psychologist Dr. Gilbert Macvaugh examine Simon to determine whether Simon is competent to be executed.

Thereafter, Simon filed an amended petition for habeas corpus relief asserting that he is incompetent to be executed, and Respondents filed an answer disputing Simon's claim. On October 3, 2013, this Court held an evidentiary hearing, where it heard live testimony and received exhibits. The parties filed post-hearing briefs. After reviewing the briefs, the Court ordered supplemental briefing on the burden of proof in this matter, which the parties have

---

[4] In connection with the federal habeas petition filed in May 2011, habeas counsel requested that funds be authorized to obtain the services of Dr. John Goff. Dr. Goff opined that a review of Simon's records "strongly suggests the occurrence of a significant neuropsychological event" around the time of Simon's admission to the infirmary, and that a neuropsychological disturbance "may indeed be interfering substantially" with his ability to communicate with his attorneys or factually comprehend his sentence and/or fate. (*See, e.g.,* Pet. Ex. G., Aff. of John R. Goff April 19, 2011) (ECF No. 1, 139 ¶ 23, ¶ 25).

provided. This matter is ripe for review.

## II. The Issue of Deference

In its opinion remanding this case, the Fifth Circuit held "that under the facts and circumstances of this case, set out in this opinion, the Mississippi Supreme Court unreasonably applied clearly established federal law by failing to apply fundamental due process principles to the first stage of Simon's competency evaluation. The process that Simon received deprived him of a meaningful opportunity to make a substantial threshold showing of incompetence and thus violated his due process rights." *Simon*, 463 F. App'x at 349. Accordingly, this Court determines the issue of Simon's competency to be executed without application of the deferential standards of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See, e.g., Panetti*, 551 U.S. at 953-54; *Ford*, 477 U.S. at 418 (holding that where the state's procedures for determining competence or sanity are inadequate, the petitioner is entitled to a *de novo* hearing on his competency to be executed).

## III. Standard for Competency to be Executed

The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the execution of a person who lacks a rational understanding of "the fact of [his] impending execution" and "the reason for it." *Ford v. Wainwright*, 477 U.S. 399, 422 (1986) (Powell, J., concurring in part and concurring in the judgment); *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007); *see also Billiot v. Epps*, 671 F. Supp. 2d 840, 853 (S.D. Miss. Nov. 3, 2009) (framing the competency to be executed inquiry as "whether the defendant has a rational understanding of his conviction, his impending execution, and the relationship between the two").

Among the various rationales for the constitutional restriction is that the execution of an insane prisoner serves no retributive purpose. *See Ford*, 477 U.S. at 408; *Panetti*, 551 U.S. at 958. In *Panetti v. Quarterman*, the United States Supreme Court noted that "[t]he potential for a prisoner's recognition of the severity of the offense and the objective of community vindication are called in question. . . if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole." *Panetti*, 551 U.S. at 958-59. Therefore, where a condemned's mental state is such that he "has no comprehension of why he has been singled out and stripped of his fundamental right to life[,]" his execution serves no retributive purpose and is prohibited. *Panetti*, 551 U.S. at 957; *see also Panetti v. Stephens*, 727 F.3d 398, 410 (5th Cir. 2013) (finding that the district court applied the correct standard when it determined that a condemned must possess "both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two").

The Supreme Court has declined to establish a rule governing all competency determinations, and it has declined to set the parameters of what a "rational understanding" requires. *Panetti*, 551 U.S. at 959 (acknowledging that "a concept like rational understanding is difficult to define"). Beyond the constitutional floor established by *Ford* and *Panetti*, the decision of how to appropriately restrict death sentences of incompetent or insane prisoners has been left to the states. *See Ford*, 477 U.S. at 416-17. Under Mississippi law, a prisoner is incompetent for purposes of execution if "the court finds that the offender does not have sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate that awaits him, and a sufficient

understanding to know any fact that might exist that would make his punishment unjust or unlawful and the intelligence requisite to convey that information to his attorneys or the court." *See* Miss. Code Ann. § 99-19-57(2)(a), (b).

The Mississippi statute makes no reference to the burden of proof.[5] After the parties in this case filed their post-hearing briefs, the Court ordered supplemental briefing, noting that Mississippi case law imposes the burden of proving incompetency to execute on the movant by both "reasonable probability" and "preponderance of the evidence" standards in various cases. (*See* ECF No. 64, citing *Billiot v. State*, 478 So. 2d 1043, 1045 (Miss. 1985) (reasonable probability); *Johnson v. State*, 508 So. 2d 1126, 1127 (Miss. 1987) (reasonable probability); *Billiot v. State*, 655 So. 2d 1, 14-15 (Miss. 1995) (preponderance of the evidence)). In response to the Court's order, Simon maintains that he bears the burden of proof on this issue by a reasonable probability, the less onerous of the two standards, while Respondents maintain that Simon bears the burden of proof on the issue by a preponderance of the evidence.

The Court finds persuasive Respondents' argument that Mississippi courts apply the "reasonable probability" standard at the application stage where a movant is seeking an evidentiary hearing, but that the "preponderance of the evidence" standard applies to address the proof adduced after an evidentiary hearing has been held. Accordingly, the Court finds that in this case, the burden falls on Simon to establish his incompetence to be executed by a preponderance of the evidence. *See, e.g.*, *Billiot v. State*, 655 So. 2d 1, 14-15 (Miss. 1995)

---

[5] The Court is aware of only one other post-*Panetti* capital habeas case in Mississippi addressing competency to execute after a federal evidentiary hearing, *Billiot v. Epps*, 671 F. Supp. 2d 840 (S.D. Miss. 2009). In that case, the United States District Court for the Southern District of Mississippi resolved the competency to execute issue without reference to the burden of proof. *See id.*

(requiring petitioner to show entitlement to relief by a preponderance of the evidence following remand for evidentiary hearing); Miss. Code Ann. § 99-39-23(7) (stating that no post-conviction relief may be granted under the section unless claim proved by a preponderance of the evidence).

## IV.  Reports of Simon's Condition[6]

Simon contends that in January 2011, he suffered a brain injury that resulted in a global amnesia, which prevents him from understanding the reason for his convictions and execution, and which renders useless any retributive purpose to the death penalty.  Respondents contend that Simon has failed to carry the burden of proof as to this issue, as the expert opinions in this case suggest that he is feigning incompetence.

Simon does not allege a long history of mental illness, nor does he assert that he is suffering with symptoms of psychosis, such as delusions or hallucinations.  Rather, he alleges that he has lost his memory.  Therefore, the Court's inquiry is whether Simon's alleged amnesic condition prevents a rational understanding of his punishment and the reasons for it.  The following evidence of Simon's current medical condition has been presented to the Court for consideration.

### A.  Attached Medical Records

At around 5:45 a.m. on January 7, 2011, Simon was transported to the prison infirmary by ambulance after a "man down" notice was issued.  (*See* Amend. Pet. Ex. D, 21).  At that time, Simon was described as nonverbal, and it was noted that Simon had bruises spiraled down his

---

[6]  The State's expert, Dr. Gilbert S. Macvaugh, III, interviewed and/or reviewed the records of many individuals whose affidavits and/or medical notes are contained as exhibits in the record.  Rather than repeat what each individual reported to Dr. Macvaugh as part of a discussion of his report, the Court, where applicable, includes his observations under a discussion of each affiant's declarations.

face.  (*Id.*).  Simon was placed under observation until Dr. Juan Santos examined him at around 7:30 a.m., at which time Simon stated that he did not understand English.  (*Id.*).  Dr. Santos recorded in a progress note that Simon "[c]laimed he slipped and fell," and he noted that Simon had "sustained superficial scratches" on his forehead and the right side of his face.  (*Id.* at 19).  Shortly thereafter, Simon was discharged with a diagnosis of "Hypertension."  (*Id.* at 22).

Simon was readmitted to the infirmary around 11:00 a.m. the same day after an apparent loss of consciousness.  (*Id.* at 17).  He was admitted with complaints of "confusions," and he reportedly exhibited an "[a]ltered neurological function" and was speaking with "word salad."  (*Id.* at 7, 18).  A nursing note recorded that at 12:35 p.m. Simon stated that he did not know what had happened to him, and it noted that he was unable to provide personal data and claimed that he could not understand English.  (*Id.* at 28).  Prison physician, Dr. Ho Young Kim, noted that Simon was complaining of confusion, an inability to recall what had happened, and severe headache.  (*Id.* at 12).  Simon was prescribed Tylenol as needed for ten days.  (*See, e.g., id.* at 9).

Simon was admitted to the infirmary.  A nursing progress report stated that Simon was "alert and verbally responsive" at 7:15 p.m. on January 7, 2011, and an entry at 11:55 p.m. noted that Simon was "asleep in bed, no further complaints made, status unchanged, [with] no incidence of fall and loss of consciousness[.]"  (*Id.* at 25).  At around 1:10 a.m. on January 8, 2011, however, Simon was described as disoriented and asking questions such as "what happened?" and "where am I?"  (*Id.* at 37).  Another record states that Simon was able to "respond appropriately to verbal commands" and experienced no loss of consciousness or confusion during the 8:00 a.m. to 4:00 p.m. shift.  (*Id.* at 35).  A progress note recorded that at 6:15 p.m. on January 8, 2011, Simon as "awake in bed [and] alert," though he would apparently

"just stare" when asked a question.  (*Id.* at 33).  The nurse reporting at 6:15 p.m appended the progress report at approximately 11:30 p.m. to record that it had been reported to her that Simon "did not touch his food."  (*Id.* at 34).

On January 9, 2011, at approximately 6:00 a.m., Simon refused to allow his vital signs to be taken[7] and refused his medications.  (*See id.* at 41).  It was reported that Simon presented as disoriented at that time, and that he stated that the medications provided to him were not his. (*Id.*).  A nursing note records that at 7:16 a.m., Simon was "alert & oriented x3, patient accepted meds, pleasant and cooperative[.]"  (*Id.* at 43).  At 10:40 a.m., Simon was described in a nursing note as "alert & oriented to person & place at this time, states he don't have any water in his cell, security did check and the water is operational," and it was noted that he again refused his vital signs.  (*Id.* at 45).

On January 10, 2010, Simon refused vital signs and his medications.  (*See id.* at 49-52; 72).  At 10:45 a.m. he asked if he could be discharged "back to camp."  (*Id.* at 57).  Simon met with a psychologist on January 11, 2011, who reported that Simon "states he is OK" and who noted that Simon was alert and oriented, and that he denied hallucinations and suicidal or homicidal ideations.  (*Id.* at 64).  On or about January 11, 2011[8], Simon was discharged with a diagnosis of Hypertension, and Dr. Kim noted that Simon was "doing well" at the time of discharge without further confusion or loss of consciousness.  (*Id.* at 55-56).

On February 24, 2011, Dr. Kim requested a psychiatric consult for Simon.  (*Id.* at 88).

---

[7]  He also refused to allow his vital signs to be taken the previous day.  (*See, e.g., id.* at 35).

[8]  The "Infirmary Discharge Summary" lists the "Actual Date of Discharge" as January 18, 2011.  (*Id.* at 62).  None of the infirmary records extend past January 11, 2011, however.

The request noted that Simon had displayed "[v]ery unusual behavior" in the previous two months, particularly in that Simon repeated words and "talk[ed] unusual[ly]." (*Id.*). Dr. Kim Nagel conducted a psychiatric assessment of Simon on March 1, 2011. (*Id.* at 97). He concluded:

> The inmate has made a change in his communication pattern in the last couple months. He has done things such as substitute the word "me" in place of "I" when he refers to himself. When I asked him about this, he said "they mean the same thing don't they." In effect he is talking baby talk. He realizes this and it appears that staff like the case manager Ms. Craft, who sees him fairly often, see this as a coping mechanism to deal with prison. He referred to one of his friends in a neighboring cell helping him out and he likes this. He was in the hospital for several days at the beginning of this change. He did not like the isolation of the hospital and said that there was nothing wrong with him. At present he seems to be totally in control of this desire to change his method of communication and has no complaints about his current status in general. I will continue to check on him on occasion, and especially make sure that Ms. Craft, who has known him for years, is comfortable with his functioning. He is oriented and able to care for himself adequately at present. I do not see any current need for further intervention.

(*Id.* at 97).

A few days later, on March 21, 2011, the United States Supreme Court denied Simon's petition for writ of certiorari, *Simon v. Epps*, 131 S. Ct. 1677 (2011), and the Mississippi Attorney General moved to set an execution date. That same day, Dr. Barry Beaven met with Simon at the request of the prison superintendent, Mr. Sparkman, in order to evaluate Simon's "memory and confusion since a previous fall." (*Id.* at 95). He noted that Simon reported always having a headache. (*Id.*). In describing his observations of Simon, Dr. Beaven reported that Simon "[d]oesn't know president, home phone, day/year, age, birthday. Doesn't know mother[']s name. Can't spell world backwards. Doesn't remember ball, flag, tree. Says me want this - 3rd person speech." (*Id.* at 95). Dr. Beaven noted:

[Simon] asked about his TV and was told that it hadn't come in yet. He knew that his closthes [*sic*] size was too small. He does have apparent memory about things he wanted. Direct questioning made all responses invalid.

(*Id.* at 96). Dr. Beaven diagnosed Simon with headaches and memory disorder, both of an

unknown type.[9] (*Id*. at 95).

**B. Simon's Attorneys**

In early 2011, one of Simon's attorneys, T.H. ("Tom") Freeland, IV, received a letter

from another prisoner in Simon's unit stating that something was "seriously wrong" with Simon

after he fell and injured his head. (Amend Pet. Ex. A, Aff. of Tom Freeland dated March 9,

2011, "First Freeland Aff."). On March 16, 2011, Freeland and one of his associates, Forrest

Jenkins, visited Simon in prison in order to discuss Simon's case with him, including the

possibility that an execution date might be set in the near future. (*See id.* at 2-3). Freeland states

that at that visit, Simon did not appear to recognize him, even though Freeland had represented

Simon for over ten years at that point and had met with him numerous times in the past. (*Id.* at

2). Jenkins, who had never met Simon prior to March 16, 2011, also states that Simon acted as

though he had never met Freeland before, and that Simon's eyes were glassy and unfocused.

(Amend. Pet. Ex. B., Aff. of Forrest A. Jenkins dated March 28, 2011, "Jenkins Aff.").

Freeland and Jenkins state that during their March 2011 meeting, Simon seemed not to

recall the names of his family members, seemed not to recall the names or amounts of his

medications, and appeared not to understand that his attorneys were not meeting with him to get

---

[9] The only medical records in the Court's possession are those attached to the Amended Complaint, and they run only through March 2011. Simon's more recent medical records were produced to Respondents and considered by Dr. Macvaugh in his report. (*See, e.g.*, ECF Nos. 39, 45; Response to Amend. Pet., Ex. B).

him out of prison, but rather, to stop the State of Mississippi from carrying out his execution. (*See* First Freeland Aff.; Jenkins Aff.). Jenkins notes that the meeting "reached a point where [Simon] simply shut down and stared at us with a blank expression" when asked about his medication. (Jenkins Aff. at 2, ¶ 4). She states that Simon nodded his head to some of her statements, but that he appeared to nod in agreement just to be agreeable. (*Id*. at 2-3, ¶ 6). She states that Simon could not recall the names of his family members, even after Freeland prompted Simon by giving him the names of Simon's mother and a brother. (*Id*. at 3, ¶7).

Jenkins reports that Simon asked "Me?" when it was explained to him that an execution date could be set for him, and that he asked whether he was going to get out of prison. (*Id*. at 3, ¶ 7, ¶8). Jenkins states that Simon became very emotional and started to cry when he was informed that he would not be released from prison, and that he asked Freeland and a guard if Freeland was really his attorney. (*Id*. at 3-4). Both attorneys report that Simon became uncommunicative and distraught after learning of the reason for their visit, and that he thereafter called the guard and ended the meeting. (First Freeland Aff. at 2; Jenkins Aff. at 4).

In an affidavit dated September 14, 2012, Freeland states that he had recently spoken with Simon, and that the conversation was essentially the same as it had been one year prior. (Amend. Pet. Ex. K, Aff. of T.H. Freeland, IV dated September 14, 2012, "Third Freeland Aff.").[10] Freeland reports: "[Simon] stated that he did not know me, although I have been his lawyer for over twelve years, and does not understand why I am representing him or remember anything about my representation." (*Id*. at ¶ 3).

_____

[10] This affidavit bears a sticker designating it as "Exhibit L," but it is docketed as Exhibit K.

Respondents' expert, Dr. Macvaugh, had several telephone conversations with Freeland as part of his evaluation into Simon's competency to be executed. Dr. Macvaugh notes that he asked Freeland to speak with Simon and encourage Simon's cooperation prior to Dr. Macvaugh's second attempt to evaluate Simon.[11] (*See* Response to Amend. Pet. Ex. B, Report of Gilbert S. Macvaugh, III, "Macvaugh Report" at 56). According to Dr. Macvaugh, Freeland stated that Simon, while accepting of the fact that Freeland is his attorney, does not appear to recognize Freeland. (*Id.*). Dr. Macvaugh reports that Freeland expressed his belief that Simon does not understand that he is facing possible execution, and that Freeland described Simon as confused by Freeland's attempt to explain the process. (*See id*.). Dr. Macvaugh reports that Freeland spoke with Simon in advance of Dr. Macvaugh's second meeting with Simon and encouraged Simon to cooperate with the evaluation. (*See id.*).

### C. Mary Craft Cotton

At the time of Simon's alleged injury in January 2011, Mary Craft Cotton had been his on-and-off caseworker at the Mississippi State Penitentiary at Parchman ("Parchman") for approximately ten years. (*See, e.g.,* Amend. Pet. Ex. C., Aff. of T.H. Freeland, IV, dated April 19, 2011, "Second Freeland Aff."; Macvaugh Report at 28). Freeland, who was unable to obtain an affidavit from Cotton at the time he filed the original petition in this matter, submitted his own affidavit recounting the details of a telephone conversation he had with Cotton on April 19, 2011. (Second Freeland Aff.).[12] Freeland maintains that Cotton informed him that upon Simon's return

---

[11] Dr. Macvaugh reports that Simon was uncooperative during the first attempted evaluation. (*See* Macvaugh Report at 5).

[12] Freeland states in his affidavit that Cotton declined to submit an affidavit herself, but that she "would be available when this proceeding is remanded for hearing to testify either live or

from the infirmary, Simon had to be reintroduced to other inmates and shown around his housing unit, despite the fact that he had been incarcerated on the same unit for decades. (*Id.* at ¶¶ 6-7). Freeland reports that Cotton stated that Simon could not remember who his friends and family were, and that he could not remember how to perform previously well-known tasks, such as how to use his prison account. (Id. at ¶¶ 7-9). He notes that Cotton reported that Simon could remember people that he had been "reintroduced" to after his return to the hospital, although he failed to show any signs that he knew them before his hospitalization. (*Id*. at ¶ 9). Freeland states that Cotton reported that Simon's condition had remained virtually unchanged since his return from the hospital. (*Id*. at ¶6).

In his report, Dr. Macvaugh references several Mississippi Department of Corrections ("MDOC") records from Simon's "Offender Log" containing entries created by Cotton. These entries, as recited by Dr. Macvaugh, report the following:

• April 6, 2011 - Simon was "given an account statement from 3-1-11 to present upon request." (Macvaugh Report at 29).

• May 19, 2011 - "Offender Simon slipped a noose over Chaplain Whisnant's head and around his neck in an attempt to strangle him to death while Chaplain Whisnant stood at his cell with a bowed head, praying with him. Chaplain Whisnant was able to break the string before any damage was done." (*Id*. at 29).

• May 24, 2011 - Cotton notes that Simon had been moved to Unit 17 on May 20, 2011, to await scheduled execution on May 24, 2011. (*Id*.).

• May 24, 2011 - Cotton notes that Simon received a stay of execution and was returned

_____

through deposition." (Second Freeland Aff. at ¶ 4).

to death row.  (*Id*.).

• May 25, 2011 - Cotton inquired whether Simon needed anything, and he reportedly stated "that he will be alright in a little while.  He further advised that he needed his TV that was never found.  He stated that he was not going to buy another TV."  (*Id*.).

• May 26, 2011 - "Was advised that Offender Simon stated on the tier after he returned from Unit 17 that he had let one white boy get away, but that he was going to kill a white boy before they kill him."  (*Id*.).

• May 27, 2011 -

Offender advised that he was not doing okay.  He stated, 'Me still need my TV.' CM [case manager] asked him what happened.  He stated, 'TV gone when they said taking me to see attorney but took me and tried to kill me and call me monster.'  He was advised that CM would follow up with Capt. Morris.  Offender Simon then stated, 'Not do any good.  Me know how to get TV.  Say I'm mean and a monster.  Now me going hunting.'  Administration was advised.  (*Id*.).

• August 17, 2011 - Cotton noted that Simon assaulted another inmate, Offender Keller, "by leaving his assigned area and r[unning] over to where offender Keller was seated on the floor.  Offender Simon tried to maneuver his waist chains around offender Keller's neck in an attempt to choke him. . . Offender Keller verified that he has never been housed around Offender Simon before and had never seen him before. . . . [T]hey did not have any conflict."  (*Id*.).

• August 19, 2011 -  Cotton records Simon's version of the events that took place on August 17, 2011 as follows:

He stated, 'I came out cell and saw Doss' cell opened.  Me saw him setting on floor and me went to get him.  When me get there, wasn't Doss.  Since me was there, me say, 'him white.  Might as well get him.'  Me coulda hurt him bad, but me didn't.["]  When asked why he wanted to get offender Doss, he stated, "Had words.  It lots more of them.  Me gonna git.  They talk bad to me.  Me can't argue, but me don't forget.  Some say glad me wasn't executed.  One say, "I don't like

you, Simon, but glad you not executed." But shouldn't be glad. Me still gonna git 'em. Next time me gonna git em bad.' [W]anted to know his account balance. He was advised. He advised that he had not eaten since he was behind the solid door because his spoon was taken. He wanted to know if his spoon was supposed to have been taken. Lt. Binion advised him that he is on property restriction, but he would give him a spoon to eat with. He wanted to know the protocol for property restriction in regards to his necessities. Lt. Binion advised him. He stated that he wanted to remain behind the solid door and did not want to return to his cell. He was advised that he cannot remain behind the solid door. He will have to return to his assigned cell when he has been released off detention. He stated, "Me know how to stay." And he threw up his thumb and winked his eye.

(*Id*. at 29-30).

• September 29, 2011 - Cotton reports that Simon "wanted to know who could visit him. CM reviewed his approved visiting list and advised him that two lawyers, Thomas Freeland and Forrest Jenkins, were approved to visit him." (*Id*. at 30).

• October 13, 2011 - "Lt. Binion advised that when Officer Taylor and he took Offender Simon to the Clinic today, Offender Simon stated, 'Me hate you brought me 'cause me came to choke Doctor. Now me can't do it.' Area I Administration was advised." (*Id*.).

• December 2, 2011 - "Offender wanted to know if a Christmas package had been ordered for him." (*Id*.).

• May 15, 2012 - "Offender waved at CM and stated, 'Hey, nice lady. Can you get me on your 'machine' and see if one of those special packages for me?' He ended with a big grin and one thumb up. CM advised that CM would check for him. He was advised that a summer package had been ordered on 5/9/12, and had been shipped." (*Id*.).

• July 18, 2012 - Cotton recorded the following about a meeting with Simon:

After CM had exited A-zone, CM was called back to the zone to see offender Simon. CM advised him that he was asleep when CM first walked through and re-affirmed that he did not want to be awakened if he was asleep. Offender stated,

"No, don't wake me up. Me try to do orange sheet for store but ended up with lots stuff me not need. Curt and Gary did sheet for me. (He's referring to Henry Curtis Jackson and Gary Simmons who were both executed last month.) Got no convict to help me. Will you help me?" CM agreed to assist him. He asked CM what was her name. CM told him. He replied, "Me call you 'Bank Account Lady.' He was advised that CM would get him to her office so they could complete his canteen order form. He was advised to bring his list price with him.

(*Id.*).

• July 18, 2012 - Cotton recorded that she assisted Simon with his canteen order form:

CM advised [Simon] of the cost including taxes. He then asked, "Me paying taxes 'cause you doing it?" CM explained to him that he would have to pay taxes regardless of who helped him to complete the order form. CM advised him that he had $56.56 left. CM asked if he wanted to order anything else. He stated, "No, me don't want nothing else." Offender was given the completed form to sign his name and to give to 3rd Watch staff.

(*Id.*).

• August 17, 2012 - Cotton records that she informed Simon of his birthdate and age upon his request. He also inquired whether MP3 players had an electrical cord or would need batteries, and Cotton stated that she forwarded the inquiry to Mr. Flemmons. (*Id.*).

• August 29, 2012 - "Offender requested assistance with completing his canteen order form. CM completed form for him. He told CM 'When white inmate come out cell on black woman guard, me almost cry 'cause me couldn't get to him. Me thought he was going to hurt her.'" (*Id.* at 31).

• September 14, 2012 - Cotton notes the following regarding a statement Simon made to her referring to his recent meeting with defense expert, Dr. John Goff:

Offender Simon wanted CM to call his attorney and let him know that the man he met with did not come back like he said he would. He told CM about his

interview last week. He stated, "Man say, 'Mr. Simon, don't fear me; here to help you. Your attorneys sent me.' Me not scared of him. Me thought he came to talk to me about me case, but he want to play remembering games.["]

(*Id*. at 31).

Dr. Macvaugh also interviewed Cotton as part of his evaluation of Simon. Dr. Macvaugh states that Cotton reported having worked with Simon for approximately twelve years, and that she reported that his speech had changed since he received his head injury. (Macvaugh Report at 54). He notes that she stated that if Simon was faking a head injury, he was "playing it to the T, he's consistent." (*Id*.). He also reports that she stated that Simon, who kept a neat cell prior to his alleged injury, now has a cell that "stinks, [is]very unkempt, [and is] messy." (*Id*.).

**D. Dr. Nagel**

Dr. Kim Nagel, a psychiatrist at Parchman, submitted an affidavit stating that he examined Simon in January 2011after his admission to penitentiary infirmary, and that Simon communicated "normally" with him at that time. (Amend. Pet. Ex. E, Aff. of Kim Nagel dated April 8, 2011). Dr. Nagel states that Simon reported that he did not want to stay in the hospital by himself, but rather, that he wanted to return to his building. (*Id*.). Dr. Nagel recalls that in another interview, Simon referred to himself as "me" instead of "I," but notes that Simon told him "that they mean the same thing." (*Id*.). Dr. Nagel recounts that Simon "was able to carry on a side conversation with other offenders in a normal manner," and that Dr. Nagel "found nothing in [his] examination that would suggest [that Simon] had a lack of understanding of his situation." (*Id.*).

In a second affidavit dated April 11, 2011, Dr. Nagel states that he did not find Simon to exhibit any memory loss when they spoke, and he notes that he has never "known of a patient

that lost long-term, mid-term, and short term memory contemporaneously." (Answer, Ex. C, Aff. of Kim Nagel dated April 11, 2011).

Dr. Nagel also apparently evaluated Simon on occasions subsequent to when Dr. Nagel's affidavits were filed in this case, as Dr. Macvaugh summarized the medical records created by Dr. Nagel in his report. According to Dr. Macvaugh, in a note by Dr. Nagel dated July 1, 2011, Simon was given a diagnosis of "rule out Adjustment Disorder Unspecified." (Macvaugh Report at 19). On July 7, 2011, Simon purportedly told Dr. Nagel "I'm doing fine. I'm not doing things like I was before. I don't need anything now." (*Id.*). According to Dr. Macvaugh, Dr. Nagel described Simon as exhibiting evidence of antisocial personality disorder. (*Id.*). Dr. Macvaugh states that the records demonstrate that when Dr. Nagel attempted to visit Simon on September 28, 2011, Simon refused to acknowledge Dr. Nagel's presence, though Dr. Nagel noted "[n]o evidence of distress other than [Simon's] refusal to interact." (*Id.*).

Dr. Macvaugh reports that Dr. Nagel's medical notes indicate that as of June 19, 2012, Simon was communicating minimally but was capable of having a brief conversation about the need for adequate hygiene.[13] (*Id.*). This record, according to Dr. Macvaugh, contains Dr. Nagel's notation that Simon exhibited no confusion or mental illness, but that he "seemed somewhat pleased to inconvenience others." (*Id.*).

Dr. Macvaugh also telephonically interviewed Dr. Nagel on April 19, 2013, and he notes that Dr. Nagel described Simon as "mean spirited" and "manipulative." (Macvaugh Report at 54). Dr. Macvaugh states that Dr. Nagel reported that he had not observed Simon to exhibit

---

[13] Dr. Macvaugh reports that Simon's MDOC records contain notes that Simon refused to bathe at times and that, at least in April 2012, he had an offensive body odor. (Macvaugh Report at 19).

credible symptoms of psychosis or brain damage. (*Id.*). Dr. Macvaugh notes that Dr. Nagel recounted that Simon was hospitalized in April 2013 after he complained of being "deathly ill" and vomiting continuously. (*Id.*). Dr. Nagel reportedly stated that no signs of illness were observed by the nursing staff, although Simon started using "baby talk" while in the hospital. (*Id.*). Dr. Nagel advised Dr. Macvaugh that Simon left the hospital the day after staff members complied with his request to give him peanut butter sandwiches to eat. (*Id.*).

### E. Dr. Beaven

Dr. Barry Beaven, a medical doctor at Parchman, evaluated Simon at the prison superintendent's request just days after the March 2011 visit by Simon's attorneys, and he provided an affidavit memorializing his recollection of his interaction with Simon. (*See* Amended Pet. Ex. H, Aff. of Bary Beaven, M.D. dated April 8, 2011). In his affidavit, Dr. Beaven notes that Simon spoke in third person during the evaluation, and that he could not perform basic spelling tasks or provide personal or historical information. (*Id.*). Dr. Beaven recounts, however, that Simon inquired during the evaluation about new inmate televisions and different-sized clothing. (*Id.*). Dr. Beaven concludes that he found no "objective evidence" that Simon had sustained a head trauma. (*Id.*).

### F. Dr. Cartier

Dr. William Cartier, a psychologist employed at Parchman, submitted an affidavit concerning his interactions with Simon in April 2011. Dr. Cartier maintains that he spoke with Simon on April 8, 2011, and found the conversation "normal." (Amend Pet. Ex. I, Aff. of William Cartier notarized April 8, 2011). Dr. Cartier reports that Simon complained of a sore mouth and tooth problems during their visit, that Simon recounted that his television received the

sports channel, that Simon wrote his identification number and name on an envelope for Dr. Cartier, that Simon spoke to the prison chaplain while Dr. Cartier was there, and that Simon was "jovial and conversant" during the visit.  (*Id*.).

Dr. Macvaugh's report contains a recitation of the mental health note Dr. Cartier created as a result of his April 2011 visit with Simon in which he describes Simon as fully oriented and normal in his speech and mood.  (Macvaugh Report at 18).  Dr. Macvaugh also notes another assessment of Simon performed by Dr. Cartier on November 2, 2011, in which Dr. Cartier describes Simon as demonstrating a normal mental status.  (*Id*. at 19).

### G.  Danny Townsend

Danny Townsend, a correctional officer at the Mississippi State Penitentiary, submitted an affidavit stating that he was working as a tier officer on Unit 17[14] on May 24, 2011, and that at approximately 12:05 p.m. on that date, Simon stated, "[y]ou know I had to play my role out, about my head injury, all the way up to my execution, you know."  (Response to Amend. Pet. Ex. A, Aff. of Danny Townsend dated January 10, 2013).  Townsend states that he completed an "MDOC Incident Report" about the remarks on May 25, 2011, and a copy of that report is attached to his affidavit.  (*Id*.).  In the "disposition" portion of that report, Warden Timothy Morris notes that Superintendent Sparkman was informed of Simon's statements, and that Superintendent Sparkman agreed that an incident report should be generated concerning Simon's statements regarding "his condition and how he was just pretending to be ill."  (*Id*.).

### H.  Paul R. Pennington, Jr.

---

[14]  Unit 17 is the unit at Parchman which houses the legal injection room.  (*See* Repsonse to Amend Pet., 14 n.4).

Paul R. Pennington, Jr., the Director of the Inmate Legal Assistance Program at the Mississippi State Penitentiary, submitted an affidavit stating that he met with Simon the first week of May 2011 in order to complete an affidavit of Simon's last requests. (Response to Amend. Pet. Ex. C, Aff. of Paul R. Pennington, Jr. dated January 9, 2013). Pennington states that as he approached Simon, Simon stretched out his hand in greeting and stated, "Hey, Mr. Pennington, how are you? Long time, no see." (*Id.*). Pennington recounts:

> That while conducting this interview, Simon was non-responsive to questions by stating, "Me not know, me not understand" until the question concerning his last meal. At that time, he clearly stated, "I want pinto beans, cornbread, fried chicken legs, sugar, lemonade, and watermelon. Make it cold watermelon, if it's not too much trouble."

(*Id.* at ¶E). The affidavit Simon completed detailing his requests and wishes upon his death are attached to Pennington's affidavit. (*Id.*).

### I. Linda Weeks

Linda Weeks, the Postal Inspector Supervisor at the Mississippi Department of Corrections, states that on March 29, 2011, the prison disallowed a package addressed to Simon. (Response to Amend. Pet., Ex. F, Aff. of Linda Weeks dated April 11, 2011). The package reportedly contained a publication entitled "*Diagnostic and Statistical Manual of Mental Disorders.*" (*Id.*).

In Dr. Macvaugh's report, under the section entitled "Additional Information Regarding Incarceration on Death Row," he notes that he received a second affidavit by Weeks dated February 12, 2013, in which she states, in part:

> [I]n 2011, prisoner Robert Simon was on mail censorship. . . in 2011 inmate Gary Simmons began writing letters to Robert Simon's list of pen pals. . . Gary Simmons was put on mail censorship. . . Gary Simmons [sic] cell number was

near Robert Simons [sic] cell number on their addresses. . . Gary Simmons
requested by mail a DSM4 [sic] to help Simon . . . a DSM4[sic] came into the
Mississippi State Penitentiary to Gary Simmons. . . prison mail inspection allowed
Gary Simmons to have it delivered to his cell.

(Macvaugh Report at 24). Dr. Macvaugh also notes that in email correspondence from Weeks to

Superintendent Sparkman dated March 28, 2011, Weeks noted that Simon had received the book

"*Diagnostic and Statistical Manual of Mental Disorders*" from a bookstore with an unverifiable

name and address. (*Id*.). She reportedly noted that "[t]he top of the packing slip has been cut off

and does not show a buyer or seller, only items shipped and it shows it is page 35 of 45." (*Id*.).

Upon inquiry to Superintendent Sparkman as to whether he wanted Simon to have the book,

Sparkman replied "[i]f policy was not followed deny the book." (*Id*.).

**J.  John R. Goff, Ph.D.**

When his petition was initially filed, Simon requested that funds be authorized for him to

retain the services of neurospychologist, Dr. John Goff. Dr. Goff had reviewed Simon's medical

records and counsel's affidavits and opined that Simon may have experienced a

neuropsychological event in January 2011, the effects of which "may indeed be interfering

substantially with his ability to communicate with his attorneys . . . preventing him from

comprehending the reasons for the penalty imposed upon him or its implications." (Pet., Ex. G,

Aff. of John R. Goff dated April 19, 2011, p. 4). After this matter was remanded, the Court

entered an order authorizing funds for habeas counsel to retain the services of Dr. Goff to

investigate Simon's claims of incompetency. (*See, e.g.*, ECF No. 21).

Dr. Goff conducted a neurological examination of Simon in September 2012 at

Parchman.[15]  As part of his evaluation, Dr. Goff reviewed Simon's medical records relating to his alleged injury in January 2011.  (ECF No. 51, Goff Report at 1-3).  He also reviewed the affidavits produced in this case.  (*Id*. at 3).  In the report he generated after completing his evaluation, Dr. Goff notes that he evaluated Simon over the course of approximately three and a half hours in a visiting room on Unit 29 at Parchman.  (*Id*.).  He recounts that Simon did not appear to understand the purpose of his visit and "expressed a lack of recall or understanding of his situation in terms of his current incarceration and the penalty which had been imposed upon him."  (*Id*.).  Dr. Goff states that after he informed Simon at length of the purpose of the evaluation, Simon agreed to cooperate in the evaluation.  (*Id*.).  Dr. Goff  reports that Simon did not think an evaluation was necessary, stating "I don't talk to no dead people," but he states that Simon appeared to accept Dr. Goff's explanation that the evaluation was occurring because of Simon's memory problems.  (*Id*.).

Dr. Goff reports that he knew little of Simon's history and knew none of the details of Simon's crimes prior to the evaluation, and that consistent with the statements in Dr. Beaven's affidavit, Simon was unable to provide him with the most basic of personal information.  (*Id*.).

---

[15]  Dr. Goff's report was docketed to the amended petition as "Exhibit L," though it bears a sticker categorizing it as "Exhibit M."  Because the report as filed was missing two pages, habeas counsel later resubmitted the report as "Exhibit L."  (*See* ECF No. 51).  The Court will refer to the substituted report at docket entry number 51 as "Goff Report" when referencing the full report.  Dr. Goff also submitted an addendum to his report, which is docketed as "Exhibit M."  (Amend Pet., Ex. M).  Dr. Goff lists the date of his evaluation of Simon as June 5, 2012 in his initial report and as September 5, 2011 in his addendum report.  Dr. Goff had not evaluated Simon as of August 30, 2012, which is when the Court entered an order allowing him the use of a computer during the evaluation.  (*See* ECF No. 26).  Dr. Macvaugh reports that the visitor log at Unit 29 shows that Dr. Goff met with Simon on September 5, 2012.  (*See* Macvaugh Report at 45 n.10).  The Court assumes, then, that September 2012 is the correct date of Dr. Goff's evaluation.

In fact, Dr. Goff states that Simon reported "a complete lack of recollection of his life prior to his entry into the institution."  (*Id*. at 4).  According to Dr. Goff, Simon reported that he did not know the individuals in photographs in his cell, he did not know the town in which he grew up, he did not know the names of the schools he had attended, and he did not know his mother's name.  (*Id.*).  Dr. Goff notes that Simon reported that he did not recall the offense for which he is incarcerated, and he denied a recollection of receiving a head injury or of being in the infirmary.  (*Id.*).

Dr. Goff observes that Simon's used "immature speech" at times during the evaluation, such as "I not know that," and that this speech occurred primarily in response to specific questions.  (*Id*.).  He notes that Simon reported that personnel are unkind to him and intentionally keep him away from other inmates, and Dr. Goff opines that Simon might be misinterpreting some general rules for the unit and "is expressing the idea that he does not understand" why he is unable to be in contact with others.  (*Id.*).  Dr. Goff reports that while Simon does not appear to have delusional thinking, he is in "a good deal of denial" about the reason for his incarceration, which Simon reported might be for "some sort of theft."  (*Id.* at 4-5).

Dr. Goff reports that Simon was able to recall a fellow inmate who had reported concerns about Simon to his attorney, and that Simon was aware that the inmate had been executed.  (*Id*. at 4).  He states that Simon's recollection of the executed inmate was the extent of Simon's reported memory, and he notes that Simon did become "somewhat upset" when Dr. Goff discussed "[Simon's] current situation in more detail."  (*Id*.).

Dr. Goff administered two symptom validity tests to Simon, both "quasi memory vehicles":  the Victoria Symptom Validity Test (VST) and the 21-Item Memory Test.  (*Id*. at 5).

Dr. Goff stated that the VST "is a computer generated forensic specific instrument designed to assess for feigned cognitive deficits." (*Id.*). Dr. Goff reports that Simon achieved the following results on the VST:

> He obtained 22 out of 24 correct responses for the easy items but only 9 out of 24 for the difficult items. The total item score was 31 out of 48. The difficult item score is a questionable score. When looking at the specific comparison with individuals feigning memory dysfunction the control group averaged 23.97 correct responses for the easy items and 23.44 correct responses for the difficult items. The feigning group obtained 20.30 average correct responses for the easy items and 10.95 for the difficult items so this man's score was below the feigning group in regard to the "difficult items." I should note that the difficult items are not really difficult; they are just harder than the easy items. This is a binomial kind of task so in order to consistently get the wrong answer it is necessary to know the right answer and assumedly get the wrong answer intentionally.

(*Id.*).

Dr. Goff also administered the 21-Item Memory Test, which is "another test for dissimulation of cognitive deficits." (*Id.*). Dr. Goff reports the following results:

> [Simon] obtained a forced choice recognition task score of 9 out of 21. That score is just below a chance performance but there is another aspect of that particular examination which gives us pause and that is that on one occasion he missed five items in a row. The probabilities of obtaining five incorrect responses in a row when there are only two selections and one selection is right and one is wrong is quite astronomical actually and is suggestive of feigning or symptom exaggeration.

(*Id.*). Dr. Goff notes that rapport was "easily established and well maintained" throughout the process, and that Simon did not become agitated or upset when Dr. Goff challenged him. (*Id.*). Dr. Goff reports that he shared some of his own personal history with Simon, such as his first grade teacher's name, and that he asked Simon why he could not recall any of that information. (*Id.*). Dr. Goff states that Simon "said he did not know but his eyes filled with tears at that point as if he was somewhat upset by his situation perhaps by what appears to have been his loss of

identity." (*Id*.).

Dr. Goff notes that his ability to perform a neuropsychological assessment of Simon was negatively impacted by the noisy environment in the contact visiting room in Unit 29, the fact that Simon's hands were shackled, and the lack of privacy. (*Id.* at 4). Nonetheless, Dr. Goff administered the Weschsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), the Reitan-Indiana Aphasia Screening Test, informal clock drawing tasks, the Trail Making Test, and the abbreviated version of the third edition of the Wechsler Memory Scale (WMS-III), along with some additional memory scale items. (*Id.* at 5). Simon obtained a full-scale score of 67 on the WAIS-IV, which is a score that Dr. Goff opines "falls at the upper end of the mildly retarded range of psychometric intelligence." (*Id.*). He notes, however, that Simon's General Ability Index (GAI) score of 76 is suspected to be closer to Simon's actual performance levels, as that index does not take the memory index into account. (*Id*. at 6).

Dr. Goff notes that the information subscale of the test (presumably the WAIS-IV) "may serve as an example of long-term retention of information and, therefore, of long-term memory." (*Id.*). Dr. Goff reports:

> [Simon] was able to tell me the function of a thermometer, the shape of a basketball and the number of seconds in a minute. He could not identify Martin Luther King or the equator and he does not know what water is made of. I must say that I am not clear on his educational background so some of those items may have been influenced by educational deprivation issues.

(*Id*.).

Dr. Goff reports that the results of the Reitan-Indiana Aphasia Screening Test and informal clock drawing demonstrate that Simon was able to correctly draw geometric figures and correctly spell "square, cross, and triangle." (*Id.*). Dr. Goff notes that Simon missed simple

mathematical items by a factor of one, which Dr. Goff suggests "may be indication for some degree of symptom exaggeration." (*Id*.).

On the Trail Making Test, which Dr. Goff describes as " a simple test of visual motor problem solving skill sometimes helpful in the identification of organic brain dysfunction," Simon completed both trails slightly above the cutoff score for an indication of organic brain dysfunction and did not make any errors. (*Id.* ).

Dr. Goff notes that the minor indications for neuropsychological dysfunction generated as a result of the tests "are in great contrast to the picture obtained of this man concerning memory issues." (*Id*.). Dr. Goff reports the following regarding his attempt to assess Simon's memory:

> [Simon] was not able to provide personal and current information. He indicated an inability to report his age or his date of birth. He said that he did not know the name of the President of the United States or the previous president or the Governor of Mississippi. He could not name the previous Governor of Mississippi either. He told me he did not know the year, the month or the day of the month. He did know that he was in Parchman Prison. He sang the alphabet to me in somewhat immature fashion. He was able to count backwards from 20. He did not seem to understand what I was asking him to do when I asked him to perform serial three additions. Logical memory for verbal matters was assessed via the subtests from the WMS-III and as we shall see it was very impaired.

(*Id.* at 6-7).

Dr. Goff reports that he attempted to assess Simon's memory by administering abbreviated versions of the third edition of the Wechsler Memory Scale ("WMS-III"). (*Id.* at 6). He reports that Simon's scores on standardized memory scores were "reflective of memory deficiencies." (*Id.* at 7). Dr. Goff described the WMS-III and Simon's results as follows:

> The tasks involved here ask the subject to listen to a paragraph with 25 elements and then to repeat those elements back. He is then confronted with four picture vignettes. The pictures are removed and he is asked to recall elements of those pictures. He was able to recall 5 out of 25 elements from the first story vignette but only 3 out of 25 from the second. On the second administration of the second

story vignette he was able to recall three elements. He was able to recall 9 out of 64 elements from the four picture vignettes. After a 30-minute delay he was able to recall zero elements from the first story vignette, zero elements from the second story vignette and obtained a score of 4 out of 64 for the four picture vignettes so he is exhibiting an almost total inability to recall information after a 30-minute delay.

(*Id.* at 7).

Dr. Goff did not attempt a formal personality evaluation, stating that he did not believe the data would be meaningful given the environment, and that, "quite frankly[,] the diagnosis is apparent" from the information reported. (*Id.*).

In his summary, Dr. Goff notes that the purpose of his examination was "to determine whether or not this man is demented and whether or not that dementia has resulted in an amnestic disorder which obviously is of some considerable severity." (*Id.* at 7). He opines that Simon "has essentially lost his identity in amnesia." (*Id.*). He determines that all of the characteristics exhibited by Simon "are suggestive of what has been referred to as Gasner syndrome or factitious disorder. There is a bit of a distinction between those two designations in that there is some dispute as to whether or not aspects of the syndrome are feigned or voluntary or not." (*Id.* at 7). He reports that Simon is experiencing "a global amnesia which affects long-term memory, recent memory and by virtue of my evaluation of him also immediate memory or immediate recall. Organically based syndromes of this sort do not exist. . . so the obvious explanation here is that this is a functional matter. The question which remains is whether or not the deficits are feigned or genuine." (*Id.* at 8).

Regarding the possibility that Simon is feigning memory loss, Dr. Goff states:

There are indications in the record that feigning is occurring. Those indications exist in the symptom validity testing. These tests are not definitive. They do not answer all of our questions but he performed at a level less than chance in one

aspect of the first test administered and in the second tests that was administered. We also have the irrefutable indication that he missed five items in a row on the 21-Item Test. The probabilities of that occurring by chance are extremely small.

There are other issues of volition involved here. It is impossible for me to say whether he actually is exaggerating these issues on purpose or whether he actually believes that he has these very substantial memory problems. That perhaps is a question which might be referred to for psychiatric opinion but from a neuropsychological standpoint it is necessary for me to inform his attorney and to inform him that his condition is not based on any neuropsychological function but rather a psychological mechanism.

(*Id*. at 8).

Dr. Goff diagnosed Simon with Dissociative Amnesia and Malingering, noting again that Simon's condition was "functional," rather than neuropsychological. (*Id*. at 9). He recommends that those around Simon "continue to inform him of his situation and not accept his contention of this complete and global amnesia. [Simon] may think that the amnesia is real but it is not and there is nothing here which would suggest that he is unable to retain newly presented material or information." (*Id*.). In an addendum, written at the request of habeas counsel, Dr. Goff iterates that he was unable to determine the extent to which Simon's memory problem is feigned "or whether he is genuinely convinced that the memory problem exists," noting that he had previously suggested that a psychiatric consultation might be beneficial. (Amend. Pet. Ex. M, 1-2). He states that Simon's "neuropsychological condition appears to be largely intact aside from this presentation of global amnesia," and opines that Simon does not qualify for a diagnosis of dementia. (*Id*. at 2).

**K. Gilbert S. Macvaugh, III, Psy.D.**

After Simon filed his amended petition, Respondents moved for and were granted an order allowing Simon to be evaluated by clinical and forensic psychologist, Dr. Gilbert S.

Macvaugh, III.  Following his examination of Simon, Dr. Macvaugh submitted a report for the Court's consideration.  (*See* Response to Amend. Pet. Ex. B, "Macvaugh Report").

Dr. Macvaugh reports that he attempted to evaluate Simon at Parchman on January 7, 2013, and that his attempt was terminated approximately thirty minutes into the interview, after Simon attempted to assault him.  (Macvaugh Report, 4-5 & n.1).  Dr. Macvaugh states that he informed Simon of his rights and the limits of confidentiality associated with the interview, and that when he asked Simon to sign and date a standard form explaining same, Simon printed his name but claimed not to know the date.  (*Id*. at 5).  Dr. Macvaugh maintains that when he pressed Simon about what date or year might be most accurate, Simon "abruptly stood up, became highly agitated, grabbed the chair he was sitting in, and threw it . . . before falling to the floor.  He was then secured by MDOC guards and was escorted back to his cell.  The evaluation was discontinued at that time because of his uncooperativeness and assaultive behavior."  (*Id.*).

Dr. Macvaugh notes that when he returned to Parchman on April 12, 2013, Simon recalled that Dr. Macvaugh was there to administer tests, though he reports that Simon stated he could not remember the purpose of the testing.  (*Id*. at 5).  Dr. Macvaugh states that after he reviewed Simon's rights and the limits of confidentiality with Simon, Simon stated that he understood those rights and limits.  (*Id*. at 6).

According to Dr. Macvaugh's review of Simon's records and Simon's own interview statements, Simon was able to correctly recount only a very limited amount of family, educational, work, substance abuse, and medical history.  (*Id*. at 6-9).  He notes that Simon "specifically denied any history of head injury or loss of consciousness, either in prison or in the free world prior to being incarcerated, and added, 'I think I'd remember that!'"  (*Id.* at 9).

Because Dr. Macvaugh was given access to Simon's complete institutional medical file, he had the opportunity to review Simon's medical records up through the time he conducted his evaluation. Dr. Macvaugh reports that on March 5, 2013, Simon was taken to the prison emergency room after a nurse assessed him lying half-off his bed, unresponsive, with labored respirations, white foam in the corner of his mouth, and with "urine noted to [Simon's] underwear." (*Id.* at 12). At the hospital, Simon was described as alert but unkempt, and the hospital admission records note that he was uncooperative. (*Id.*). Dr. Macvaugh notes that radiology records generated days later indicate that Simon was seen for "loss of appetite; weight loss," but that the impression was "[u]nremarkable exam." (*Id.*).

Dr. Macvaugh notes that a nursing assessment states that on March 9, 2013, Simon shook the bars in his cell, knocked on the window, and threw his juice on the floor while demanding peanut butter and jelly. (*Id.* at 13). An emergency record from the prison infirmary dated March 12, 2013, states that Simon was alert but answered only the questions he wanted to, and it notes that Simon had been vomiting and had stomach pains, though he asked for a peanut butter snack bag. (*Id.*). Dr. Macvaugh reports another medical record, dated March 12, 2013, as follows:

> Simon was brought in by EMS as "unresponsive." These records note that "On arrival EMT told by patient that he did not receive his peanut butter sandwich and he became upset. On arrival at Unit 42, when asked about the peanut butter sandwaich [sic] the patient began to laugh. No evidence of pathology. Return to unit." He was described and oriented times three "sitting up on the ER stretcher, smiling and laughing. . . [Simon] states 'I'm ok now. Just waiting to go back to my unit.'"

(*Id.)*. Dr. Macvaugh also notes that in an emergency record dated April 10, 2013, Simon complained he was unable to walk, but that an officer reported that Simon had been able to walk that day. (*Id.*).

Dr. Macvaugh also reviewed records relating to Simon's psychiatric history since his imprisonment. Throughout his incarceration, Simon complained of depression and stress at various times. (*Id.* at 13-17). Dr. Macvaugh notes that these records show that on April 28, 2011, Simon asked a mental health worker, Jennifer McBride, who she was, and he stated that he did not know the president. (*Id.* at 18). Dr. Macvaugh reports that she noted:

> [Simon's] use of baby talk is limited when he is engaging in general conversation, but becomes more prevalent when asked direct questions. His thought content is logical as he is able to associate date with time and president with politics. His judgment is good as he voiced hopes that I would have a good day and that all of his needs are met.

(*Id.*). Dr. Macvaugh notes that on May 5, 2011, McBride again saw Simon and described his speech, thought content/thought process, and mood as normal. (*Id.*).

According to Dr. Macvaugh, both Dr. Cartier and Ms. Leflore, a social worker, noted Simon's mental status as normal in assessments conducted between November 2011 and April 2012. (*Id.* at 19). Dr. Macvaugh reports that a nurse's note in April 2012 indicates that Simon had an offensive body odor and was advised of hygiene, and that Leflore noted on July 20, 2012, that Simon would "smile[] and wave[]" when asked to bathe. (*Id.*). A follow-up on October 17, 2012, apparently yielded similar results, as Dr. Macvaugh notes that Leflore recorded that Simon "only waves and smiles" during attempted assessments. (*Id.*). Dr. Macvaugh notes that the records state that on January 23, 2013, when Leflore met with Simon for an assessment, Simon was observed "up having a normal conversation with another inmate." (*Id.*). Dr. Macvaugh records that on April 18, 2013, Leflore described Simon's speech, thought content/thought process, mood, and affect as normal, although she noted that Simon's appetite had purportedly changed, and he acted "[as] if he is not able to flush the toilet and walk." (*Id.*).

Dr. Macvaugh reports that during his telephone interview with former Mississippi Department Of Corrections ("MDOC") Commissioner, Christopher Epps, Epps stated that Simon "was talking good" and giving away his property on the day of his scheduled execution. (*Id.* at 54-55). He reports that Epps recalled that when Epps asked Simon whether he cut off the finger of one of the victims[16], Simon stated, "You think I'm a monster? I'm a good guy like you." (*Id.* at 55). Dr. Macvaugh notes that Epps reported that Simon did not appear to have any trouble recognizing Epps, and that Epps stated that he did not believe that Simon is "crazy." (*Id.*).

Dr. Macvaugh reports that during his second meeting with Simon on April 12, 2013, Simon gave what Dr. Macvaugh deemed to be "largely superficial" cooperation with the evaluation. (*Id.* at 57). He reports that Simon spoke with childlike speech, but that his "sentence structure was not consistently abnormal throughout" the evaluation. (*Id.*). He reports that Simon's thought content and thought process did not appear to be abnormal, stating that Simon's "thought content did not appear to contain any indication of paranoid, grandiose, or other delusional ideas." (*Id.*). Dr. Macvaugh notes that Simon denied having special powers or hallucinations, and that while Simon reported that he felt as though other prisoners might want to harm him, Simon stated that he believed the guards did "a real good job." (*Id.* at 58).

Dr. Macvaugh states that Simon "appeared to put forth variable effort" during a brief cognitive screening and "very poor effort" to those tasks obviously designed to assess memory functioning. (*Id.* at 58-59). Dr. Macvaugh notes that Simon denied knowing how long he had been in prison, the name of the building in which he was housed, the name of his unit, his zip

---

[16]  The pathologist conducting the autopsies of the murder victims determined that one victim's ring finger had been amputated post-mortem. *See Simon v. Epps*, 2007 WL 4292498, at *3.

code, and his State inmate number. (*Id*. at 59). Dr. Macvaugh states that Simon recalled that he had received a rule violation report based on his actions in his first meeting with Dr. Macvaugh, and that Simon recalled that prison officials took away his privileges, such as his canteen orders, as a result. (*Id.* at 60). Dr. Macvaugh notes that Simon denied having problems with his memory, although he could not recall his age, date of birth, height, or weight. (*Id.*).

Dr. Macvaugh administered various psychological tests to Simon, including two memory tests and two measures designed to screen for malingering. On the Rey 15-Item Memory Test (R-FIT), which screens for suboptimal effort and feigned memory impairments, Simon scored 9 out of 15, which Dr. Macvaugh reports falls "on the border between adequate and sub-optimal effort." (*Id*. at 60). Dr. Macvaugh also administered to Simon the Test of Memory Malingering (TOMM), which is a 50-item visual memory recognition test consisting of two learning trials and an optional retention trial. (*Id.*). Dr. Macvaugh notes that "[s]cores lower than 45 out of 50 on Trial 2 or the Retention Trial indicate malingering." (*Id.*). Dr. Macvaugh reports that Simon scored 32/40 on Trial 1; 40/50 on Trial 2; and 33/50 on the Retention Trial. (*Id.*). Dr. Macvaugh states Simon's scores on Trial 2 and the Retention Trial "fell below the cutoff and were in the range of scores that are suggestive of attempts to malinger memory/cognitive deficits." (*Id.*).

Dr. Macvaugh also administered to Simon the Miller Forensic Assessment of Symptoms Test (M-FAST), a 25-item screening instrument designed to provide information regarding the probability that the examinee is malingering symptoms of psychiatric disorders. (*Id*.). He noted that scores greater than 6 indicate malingering, and that Simon obtained a score of 2, "which suggests that he was not attempting to malinger symptoms of mental illness, such as psychosis."

(*Id*.).

The final screening measure administered to Simon by Dr. Macvaugh was the Structured Inventory of Malingered Symptomatology (SIMS), a 75-item self-report screening measure used to detect malingering across five individual scales: Psychosis, Neurologic Impairment, Amnestic Disorders, Low Intelligence, and Affective Disorders. (*Id*. at 61). Dr. Macvaugh notes that Simon produced an elevated score suggestive of malingering on the Neurological Impairment Scale, the Amnestic Disorder Scale, and the Low Intelligence Scale. (*Id.*). He reports that Simon did not appear to be attempting to malinger symptoms of psychosis or of an affective/mood disorder, but that his elevated scores on the other three scales, combined with his elevated total score, "are suggestive of attempts to malinger intellectual limitations, neurologic impairment, and amnesia." (*Id*. at 61). Dr. Macvaugh reports that he did not attempt to conduct any further performance-based testing, as Simon's scores on the malingering tests showed that his scores on other instruments would have yielded invalid results. (*Id.*).

Dr. Macvaugh states that he attempted to assess Simon's abilities relevant to his competency to be executed, and he notes that he made specific inquires into Simon's factual and rational understanding of his punishment. (*Id*.). Dr. Macvaugh states that Simon was unable to convey how long he had been in prison, the location where his trial was held, the sentence he received, or the specific method used by the State to execute a death-sentenced inmate. (*Id.*). He reports that Simon stated that a death sentence meant that prison officials would take the condemned "out of the building, take them somewhere, kill them and never come back." (*Id*. at 61). He reports that Simon elaborated by stating that "they take them somewhere, feed them good, and kill them. . . I hear other prisoners talking about what they ordered. . . They talk about

what a person eat last on TV." (*Id.*). Dr. Macvaugh states that he asked Simon to explain the procedures that a death-sentenced inmate undergoes to prepare for the execution, and he reports that Simon replied, "I just know they come and get people in their cell and take them away and never come back." (*Id.*). Dr. Macvaugh notes that Simon reported that he had seen this process occur "about two times," and that Simon specifically noted that he saw the process occur with an inmate named Gary, who had helped him write letters and make canteen purchases. (*Id.* at 61-62). Dr. Macvaugh states that when asked what happens to an inmate's property prior to his execution, Simon stated that "[t]hey pack it up. . . they probably sell it, give it to charity, I not know." (*Id.*). He also reports that Simon stated that, after an execution, an inmate's remains are buried or "burned up." (*Id.* at 62).

Dr. Macvaugh reports that Simon "acted surprised" about being informed that he was on death row and "claimed not to understand the significance of it." (*Id.*). He notes that Simon did, however, state that "[t]hat's the other part of my address" when asked about being housed on death row, despite being unable to recall his mailing address previously. (*Id.*). Dr. Macvaugh reports that he asked Simon whether inmates housed on death row will be released from prison one day, and that Simon replied "maybe." (*Id.*).

Dr. Macvaugh indicates that he asked Simon a series of questions to determine Simon's understanding of the reason for his punishment. Dr. Macvaugh states:

> Asked to describe his understanding of the reason why he is in prison, Mr. Simon replied, "Uh, probably for killing somebody like everybody else in this building in here for. . . I think everybody in this building in here for killing somebody." Asked to describe specifically what he did and how he came to be in prison, he replied, "I not know. . . I guess they said I kill somebody or something. . . I can't remember killing somebody, but it must be right."

(*Id.*). Dr. Macvaugh states that Simon denied any recollection of the sequence of events leading

to his conviction, and he denied knowledge of the number of victims, the sex of the victims, their ages, or their names.  (*Id*.).  Dr. Macvaugh reports:

> Asked what he believes is just about his conviction, Mr. Simon replied, "I not remember being in court. . . uh, if I killed somebody, then they got it right. . . I probably shouldn't say that though [laughs]."  Asked what he believes is unjust about his conviction, he replied, " I not know."  Asked if he considered his conviction to be fair and accurate, he replied, "I not know."  Asked to describe his belief regarding why other people are convicted of similar crimes, he replied, "because it was against the law of Mississippi."  Asked what he believes about the type of punishment that anyone else would receive for similar crimes, he replied, "Uh, they kill, so they be killed. . . it's pretty fair because they do it out there in the street every day."  Asked why different degrees of punishment are given, he replied, "I not know."  Asked if there was anything specific about his charges that most people would not understand unless he told them, he replied, "I not even understand."

(*Id*.).  Dr. Macvaugh states that he asked Simon to explain his understanding of the reason for his execution, and that Simon acted surprised and began to cry when Dr. Macvaugh explained Simon's legal situation to him.  (*Id.* at 63).  Dr. Macvaugh reports that he explained Simon's current legal status, and that Simon acted confused and tearful, stating "I not whacked my head! I not fall and hit my head!"  (*Id*.).

Dr. Macvaugh reports that he also asked specific questions to ascertain Simon's ability to appreciate and reason.  He reports that Simon stated that when a person is dead, "you go to hell if you've been bad all the time, or you go to heaven and you get your wings if you good. . . I think there is a lot more to it, but that's basically it."  (*Id*.).  He notes that Simon stated that a person could not live again after being dead, and that the person's body either "rot[s]" or is "burned up" after he dies.  (*Id*.).  Dr. Macvaugh reports that when Simon was asked what would happen to him if he were to die, Simon responded:  "I been trying to be good just to get my wings in heaven. . . I'm not ready to die. . . I not want to go to hell."  (*Id*.).  Dr. Macvaugh reports that

Simon stated that the "main" way to determine if a person was dead was if "[t]hey not breathe no more." (*Id.*).  Dr. Mavaugh states that when asked if Simon believes that a person would not actually die if executed, Simon replied, "I don't think so. . . They not coming back." (*Id.*).

Dr. Macvaugh reports that when asked how he felt about being executed, Simon stated "[i]f they say I did it, then they got to kill me for it." (*Id.*).  He notes that when he asked Simon whether he wanted to be executed, Simon replied, "No!  I want to live, but again, I be in so much pain," complaining that his head and mouth "hurt all the time." (*Id.*).  Dr. Macvaugh reports that he asked Simon how his family might be affected by Simon's execution, and that Simon replied, "I not think they really like me right now, so I not know. . . I think they be sad some." (*Id.*).  Dr. Macvaugh states that when he asked Simon if there was any reason to look forward to being executed, Simon replied,  "Yeah, heaven. . . and stop my pain." (*Id.*).

Dr. Macvaugh notes that Simon stated that he would accept the fact that he was going to be executed "[i]f the Judge says yes," and that he could not identify any particular reason why he might not be executed. (*Id.*).  Dr. Macvaugh notes that Simon denied that prison officials had ever removed him from his cell and escorted him to the place where he had seen other inmates go prior to being executed, and he denied ever having requested a last meal prior to receiving a stay of execution. (*Id.* at 64).

Dr. Macvaugh recounts that Simon reported not knowing the name of his attorney, and that he failed to correctly identify his attorney when his attorney's name was mentioned in a list along with two other defense attorneys. (*Id.* at 64).  He reports that Simon denied knowing how to contact his attorney. (*Id.*).  Dr. Macvaugh notes that Simon reported that he spoke with his attorney "[f]our yesterdays ago," but that he denied knowing the frequency with which his

attorney contacts him. (*Id*.). Dr. Macvaugh recounts that Simon reported that he did not trust his attorney, and that Simon expressed disagreement with his attorney's "lie to the court about me hitting my head[.]" (*Id*.). Dr. Macvaugh records that he asked Simon whether it is possible that he did hit his head and simply does not remember, to which Simon replied, "Naw. . . that sounds like some kind of fancy lie!" (*Id.*).

Dr. Macvaugh states that Simon was asked if he knew any additional information about the status of his case, and that Simon replied that he only understood that "[i]f my attorney win, they not kill me. . . If my attorney lose, they tell me pack my stuff and they kill me." (*Id*.). Dr. Macvaugh reports that Simon was aware that "the Court, the Judge" would be responsible for making a decision about his case, and that he would need to tell his attorney any information that might potentially help his case. (*Id.* at 64-65).

Dr. Macvaugh's diagnostic impression of Simon included an Axis I diagnosis of Malingering (Memory/Cognitive Deficits) and Cannabis Abuse, and an Axis II diagnosis of Rule Out Antisocial Personality Disorder.[17] (*Id*. at 65). Dr. Macvaugh opines "to a reasonable degree of psychological certainty that Mr. Simon is not suffering from any symptoms of a major mental disease or defect that would significantly impair his factual and rational understanding of the punishment he is facing and the reason for it, as contemplated by the United States Supreme

---

[17] Dr. Macvaugh offered an Axis I diagnosis of Malingering and Cannabis Abuse. He offered a diagnosis of "Rule Out Antisocial Personality Disorder" on Axis II. "Axis I" and "Axis II" refer to a clinical system of assessment adopted by the American Psychiatric Association in its diagnostic manual. Axis I disorders refer to clinical disorders, while Axis II disorders refer to personality disorders and specific developmental disorders. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. text rev. 2000). This multiaxial system was dropped in the latest addition of the manual. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

Court in *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Panetti v. Quarterman*, 551 U.S 930 (2007)." (*Id.*).

In support for his conclusion, Dr. Macvaugh states that the records provided to him describe Simon's mental functioning over the course of his nearly two-decade period of incarceration on death row, and that they demonstrate that Simon "was never considered to be suffering from a major psychotic or thought disorder and was never described as demonstrating any type of memory or other cognitive-related deficits." (*Id.* at 67). Dr. Macvaugh notes that while Simon was treated with psychiatric medications for depression and adjustment issues at various times during his incarceration, he continued to be described by prison mental health professionals as demonstrating no symptoms of mental illness even when he was not treated with medications. (*Id.*). Dr. Macvaugh states that Simon was not described as demonstrating symptoms of mental illness until January 2011, when he reportedly fell in his cell and suffered an alleged head injury approximately four months prior to his scheduled execution date. (*Id.*).

Dr. Macvaugh reports that there is "substantial data available to question the credibility of Mr. Simon's alleged head injury, as well as his alleged memory/cognitive impairments as a result of that reported injury." (*Id.*). Dr. Macvaugh notes that the statements attributed to Simon through the affidavits and/or reports of Officer Townsend, Paul Pennington, Mary Cotton, and Christopher Epps reflect that Simon was faking an illness, that he was able to recognize prison officials, that he knew the punishment he was facing, and that he had some knowledge of the role of his attorney and Dr. Goff. (*Id.* at 68-70).

Dr. Macvaugh notes that Simon purchased writing tablets, envelopes, and postage stamps from the commissary after his alleged head injury, and Dr. Macvaugh maintains that prison mail

records suggest that Simon may have continued to write letters during that time. (*Id.* at 69). Dr. Macvaugh notes that numerous letters, some of which were purportedly written by another inmate, Gary Simmons, were intercepted by prison postal officials, and that there are similarities between the letters purportedly written by Simmons and Simon's dental and medical care request forms, which were written in Simon's own hand. (*Id.*). Dr. Macvaugh, who concedes that he is not a handwriting analyst, notes that if the letters were, in fact, written by Simon after the date on which he received a stay of execution, it "would strongly argue against Mr. Simon suffering from any type of genuine cognitive impairment[.]" (*Id.*).

Dr. Macvaugh reports that the contents of the letters that were confiscated by prison postal officials also provide reason to question whether Simon actually wrote the letters that were purportedly written by Simmons. (*Id*. at 69). He notes that in one letter Simon wrote to an individual in Canada in 2009, Simon made statements about how his family members were acting to stop executions in Mississippi, and that he would have to stop writing to his friends and family until he could get a life sentence. (*Id*. at 69-70). Dr. Macvaugh notes that Simon included in that letter a separate "Dear Friend of Robert" letter, in which he set forth instructions for the pen-pal to distribute the letter to churches and anti-death penalty organizations. (*Id*. at 70). Dr. Macvaugh notes that Simon wrote in that letter, "I'm not sure if you are aware of it yet but Robert's mind have went bad[.]" (*Id.*). Dr. Macvaugh notes that another, similar letter written by Simon, he asks the receiver to petition the governor to convert Simon's sentence to life without parole due to his "mental condition." (*Id.*).

Dr. Macvaugh records that in another envelope from Simon to his sister-in-law, Simon apparently prepared and included an outline "Affidavit" with instructions and on how to fill in

the blanks.  (*Id.*).  Dr. Macvaugh reports that the blank affidavit states, "I have observed a significant change for the worst in convict Robert Simon Jr. daily functioning and behavior since March 2009."  (*Id.*).  Dr. Macvaugh opines that these letters indicate that for at least two years prior to his May 2011 stay of execution, Simon was implementing a plan to block his execution.  (*Id.*).  He notes that Simon used "several different approaches" to do so, including soliciting assistance from various organizations and groups and engaging in dishonest practices.  (*Id.*).

Dr. Macvaugh also reviewed Dr. Goff's report and addendum and determines that there are limitations in Dr. Goff's evaluation that "substantially impact" his conclusions.  (*Id.* at 71).  First, he notes that Dr. Goff reported little knowledge of Simon's history, which Dr. Macvaugh opines is "critically important" to a forensic mental health evaluation.  (*Id.*).  Dr. Macvaugh also notes that Dr. Goff did not appear to directly assess Simon's competence-related abilities or offer a forensic opinion regarding Simon's competence to be executed.  (*Id.*).  He determines that Dr. Goff also "provided what should be viewed as essentially two competing diagnostic conclusions" by diagnosing Simon with both Dissociative Amnesia and Malingering.  (*Id.*).

Dr. Macvaugh reports that the diagnostic criteria for Dissociative Amnesia are as follows:

A.  The predominant disturbance is one or more episodes of inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by ordinary forgetfulness.
B.  the disturbance does not occur exclusively during the course of Dissociative Identity Disorder, Dissociative Fuge, Posttraumatic Stress Disorder, Acute Stress Disorder, or Somatization Disorder and is not due to the direct physiological effects of a substance (e.g., a drug abuse, a medication) or a neurological or other general medical condition (e.g., Amnestic Disorder Due to Head Trauma).
C.  The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

(*Id.*; citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 523 (4th ed. text. rev. 2000) (DSM-IV-TR)).  Dr. Macvaugh notes that Simon's

inability to recall information has been chronic, not episodic, and that his inability includes basic, non-traumatic information. (*Id.* at 72) He notes that Simon's alleged amnesia "has occurred in the absence of any known traumatic event that would ordinarily be associated with the type of *psychological* trauma or stress required for this particular type of *dissociative* disorder." (*Id.*) (emphasis in original).

Dr. Macvaugh opines that an appropriate diagnostic consideration, if Simon's complaints were determined to be genuine, would be Amnestic Disorder Due to Head Trauma. (*Id.*) He notes that Simon does not meet the DSM-IV-TR diagnostic criteria for Amnestic Disorder Due to Head Trauma, however, as criterion D of that diagnosis requires evidence that the "disturbance is the direct physiological consequence of a general medical condition[,]" and Simon's records argue against the presence of a genuine general medical condition that might ordinarily result in amnestic symptoms. (*Id.*).

Dr. Macvaugh also notes that "Malingering" is not a clinical disorder, but rather, is considered one of categories of "Other Conditions That May Be a Focus of Clinical Attention" in the DSM-IV-TR. (*Id.*). Malingering is defined as follows:

> The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. Under some circumstances, Malingering may represent adaptive behavior – for example, feigning illness while a captive of the enemy during wartime.
> Malingering should be strongly suspected if any combination of the following is noted:
> 1. Medicolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination)[.]
> 2. Marked discrepancy between the person's claimed stress or disability and the objective findings[.]
> 3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen[.]

4. The presence of Antisocial Personality Disorder[.]

(*Id*. at 73, citing DSM-IV-TR at 739). Dr. Macvaugh concludes that the data suggests that Simon has antisocial personality traits and perhaps Antisocial Personality Disorder, and that Dr. Goff's failure to discuss any of Simon's "rather obvious antisocial personality traits illustrates another limitation to Dr. Goff's diagnostic conclusions. (*Id.* at 73-74).

Dr. Macvaugh suggests that "the presence of malingered memory deficits would likely negate the presence of a genuine amnesia, regardless of its particular etiology (i.e., whether due to a dissociative state, head trauma, or some other general medical condition)." (*Id.* at 74). He determines that Simon has not displayed credible evidence of a major mental disease or defect, and that there is no indication that Simon has a psychotic or mood disorder. (*Id*.). He opines that Simon's purported inability to recall basic personal history is "neither credible nor consistent with genuine memory impairment." (*Id.*). He notes, for example, that Simon recalled on their second meeting that he was "mean" to Dr. Macvaugh in the initial meeting three months prior, and he recalled that he lost prison privileges after he received a rule violation report as a result of his behavior during the meeting. (*Id*.).

Dr. Macvaugh opines that Simon's present behavior represents his attempt to feign a memory disorder. (*Id*. at 75). He notes that Simon attempts to feign recall of simple personal facts, which tends to be fairly well preserved for those who suffer genuine amnesia. (*Id.*). He also notes that Simon's testing results, which indicate an attempt to malinger cognitive or memory problems while not attempting to malinger psychiatric symptoms, "were very likely purposeful and in the service of creating the impression that his current clinical presentation is related to his sustaining a head injury." (*Id*.). Dr. Macvaugh opines that Simon's attempts to

feign memory or cognitive problems deserve "special consideration, particularly within the context of his apparent efforts to obtain a copy of the DSM-IV[.]" (*Id.*).

Dr. Macvaugh also notes that while Simon was uncooperative and attempted to assault him at their first meeting, Simon was cooperative with Dr. Macvaugh after habeas counsel spoke with Simon and suggested that Simon cooperate with the evaluation. (*Id*. at 76). Dr. Macvaugh notes that Simon's "vastly different behavior" in their second meeting "suggests that not only did Mr. Simon recall having met with his attorney prior to my second visit with him, but Mr. Simon was also able to follow the advice of his attorney regarding the need to cooperate with the evaluation." (*Id.*). Simon's cooperation, according to Dr. Macvaugh, supports a conclusion that his alleged memory impairment is not genuine. (*Id.*). He notes that "[a]lthough Mr. Simon clearly appears to be unwilling to acknowledge that he understands the punishment he is facing and the reason for it, an *unwillingness* to do so does not necessarily equate to *incompetence* to do so." (*Id.*) (emphasis in original).

Dr. Macvaugh finds that there is no documented evidence that Simon actually suffered a traumatic brain injury, and he notes that Simon's performance on four out of five malingering tests was suggestive of attempts to feign memory deficits. (*Id.*). He notes that, with the exception of the information provided by Simon's attorneys, the information obtained from multiple sources and multiple contexts, including Simon's own defense-hired expert, suggests that Simon is malingering. (*Id.*).

Dr. Macvaugh concludes as follows:

[I]t is my opinion that Mr. Simon does not suffer from any type of major mental disease or defect. In my opinion, Mr. Simon's current clinical presentation is better explained by his naive attempts to malinger memory deficits and his rather severe antisocial personality traits. It is also my opinion that there are no valid

46

data currently available to indicate that Mr. Simon demonstrates any genuine
significant impairment in those abilities necessary for competence to be executed,
as set forth in the case law by the U.S. Supreme Court and the relevant
Mississippi state statute.

(*Id.* at 77).

## V.  The Evidentiary Hearing

After the Court reviewed the amended pleadings and the reports of the experts, it

scheduled an evidentiary hearing in this matter.  The hearing was held on October 3, 2013.  Only

three witnesses testified:  Simon's attorneys - Forrest Jenkins and T.H. Freeland, IV - and the

State's expert, Dr. Gilbert S. Macvaugh, III.  The only exhibits offered at the hearing were the

reports of Dr. Goff and Dr. Macvaugh, which were introduced by Respondents.  The relevant

testimony of each witness is as follows:

### A.  Forrest Jenkins

Forrest Jenkins, a practicing attorney formerly employed at Freeland & Freeland,

Lawyers, testified that she first met Simon in March of 2011, when she accompanied Freeland to

visit Simon.  (Hr'g Tr. at 7-8).  She stated that the visit was "pretty upsetting," as Simon was

"vacant" and "distant" when she and Freeland attempted to speak to him.  (*Id*. at 8).  Jenkins

testified that while Simon knew he was there to visit his lawyer, he did not appear to recognize

Freeland.  (*Id*.).  She maintained that the visit lasted approximately thirty minutes to an hour, and

that it ended when Simon became frustrated, turned his back to his attorneys, and refused to look

at them or respond to them.  (*Id*. at 8-9).  She stated that Simon was "thin and disheveled," and

that he appeared to be in poor physical condition, even given the fact of his incarceration.  (*Id.*).

Jenkins stated that Simon did not seem to understand that his attorneys were there to

discuss the possibility that an execution date might be set for him, and that he did not seem to

realize the reason why he was in prison. (*Id*.). She stated that Simon also did not seem to understand why his attorneys would request to contact his relatives, and that he did not understand their attempts to explain the clemency process. (*Id.*).

On cross-examination, Jenkins stated that she did not have any psychological training and that she had never met with anyone else on death row. (*Id*. at 10). She stated that she had only met with Simon on one occasion and had no opinion as to whether he was competent at the time of the evidentiary hearing. (*Id*. at 11-12). Jenkins testified that she had not read Dr. Goff's conclusions, but she stated that she was aware that he was not being called to give testimony at the evidentiary hearing, as his report could not exclude the possibility that Simon was malingering his memory deficits. (*Id*. at 12-13).

### B. T.H. ("Tom") Freeland, IV

Tom Freeland testified that he began representing Simon in 1999, and that he had visited Simon in person approximately once a year thereafter. (*Id.* at 15-16). He recounted that prior to his visit in March 2011, Simon was always capable of understanding what was occurring in his case and was "very serious" in his desire to know the status of his case and of any new developments. (*Id*. at 16). Freeland stated that in his previous visits, Simon could recall his family members and respond appropriately to Freeland's explanations about the case. (*Id*. at 16). He also testified that Simon was previously capable of communicating what he believed to be deficiencies in his trial. (*Id.* at 16-17).

Freeland reported that when he went to visit Simon in March 2011, he believed that the Mississippi Supreme Court might soon be asked to set an execution date for Simon. (*Id.* at 17-18). The purpose of the visit, he stated, was to talk with Simon about the option to seek

clemency. (*Id.* at 18). Freeland testified that when he met with Simon in March 2011, he noticed that Simon had undergone a substantial physical deterioration, and that Simon failed to recognize him. (*Id.*). Freeland stated that he had previously received a telephone call from a death-row inmate and the inmate's lawyer stating that an incident had occurred where Simon had apparently hit his head and was found unconscious in his cell. (*Id.* at 19). Freeland testified that when he met with Simon, he believed Simon's behavior and that incident were connected. (*Id.*). Freeland stated that his attempts to explain who he was and why he was there only seemed to agitate Simon. (*Id.*). Freeland stated that he attempted to explain to Simon the factual background of his offenses, and that Simon grew upset, began to cry, and turned away from his attorneys. (*Id.* at 95-96).[18]

Freeland reported that he had some experience representing criminal clients with mental issues, and that he had been involved in numerous cases where an individual's capacity to execute a will was at issue. (*Id.* at 20-21). He also reported that he had been involved in three tort cases where his client had closed-head injuries. (*Id.* at 22). Freeland stated that at the time he met with Simon in March of 2011, he "saw no sign that [Simon] understood why I was talking to him [or] what his case was about." (*Id.*). Freeland maintained that while Simon appeared to understand that he was in prison for having committed a crime, he was not then aware of what the details of his conviction were. (*Id.*).

Dr. Goff's report and addendum were admitted into evidence on cross-examination. (*Id.* at 25). Freeland stated that he had no explanation for Dr. Goff's statement that he was unfamiliar with Simon's history, stating that he had discussed some of Simon's historical information with

---

[18] This particular testimony was elicited in rebuttal to the questions the Court posed to Dr. Macvaugh at the evidentiary hearing.

Dr. Goff. (*Id.* at 27). Freeland stated that he had no particular training into determining whether someone is malingering, and he admitted that if Simon previously told someone that "he was going to play crazy," it could have some bearing on Freeland's opinion as to Simon's competency. (*Id.* at 30). However, Freeland estimated that he had met with Simon three times since March 2011, and that it was his opinion that Simon did not understand the nature of his crime or why he was to be executed. (*Id.* at 28). Freeland testified that Simon does not appear to recognize him, even if Simon knows in an abstract sense that Freeland is his lawyer. (*Id.* at 28-29).

### C. Dr. Gilbert S. Macvaugh, III

Dr. Gilbert S. Macvaugh, III, accepted by the Court as an expert in the field of forensic psychology, testified as the sole witness for Respondents. When Dr. Macvaugh approached the witness stand, Simon, who was seated at the table with his counsel, stated, "[t]hat my attorney, that my attorney right there" and pointed to Dr. Macvaugh. (Hr'g Tr. at 73).[19]

Dr. Macvaugh testified that he had been contacted by counsel for Respondents in December 2012 and asked to perform an evaluation of Simon, whom he had knowledge of as a result of his previous forensic evaluation of Simon's co-defendant, Anthony Carr. (*Id.* at 38-39). Dr. Macvaugh stated that he met with Simon at Parchman on two separate occasions in order to evaluate Simon and render opinions that would aid or assist the Court in determining Simon's competency for execution. (*Id.* at 39). Dr. Macvaugh maintained that his evaluation of Simon on January 7, 2013, had to be terminated after Simon attempted to assault him, but that he was

---

[19] Simon's outburst was not captured by the court reporter at the time it was uttered, but the parties agreed that the statement as later read into the record by the Court was accurate. (*See* Hr'g Tr. at 73).

able to evaluate Simon fully on April 12, 2013. (*Id*. at 39-40). A copy of Dr. Macvaugh's seventy-seven page report of that evaluation was introduced into evidence through his testimony. (*Id.*).

Dr. Macvaugh stated that before he met with Simon, he reviewed Simon's records; spoke by telephone with "five different collateral informants;" interviewed Mary Cotton, Simon's case manager at Parchman; telephonically interviewed Dr. Kim Nagel, the treating psychiatrist at Parchman; interviewed John Ricks, an Investigator with the Criminal Investigative Division at Parchman; interviewed Christopher Epps; and spoke with Simon's habeas counsel, Tom Freeland, on two or three occasions. (*Id*. at 41-42). He testified that he also reviewed Dr. Goff's report and addendum report. (*Id*. at 42).

Dr. Macvaugh stated that he understood his role in a competency for execution evaluation as requiring him to "collect the data, conduct the assessment, and form an opinion that is consistent with the relevant legal standard for competence to be executed" as set forth in *Ford* and *Panetti*, which he understood to require that a person facing execution have a factual and rational understanding of "the punishment they are facing, and the reason for it." (*Id.* at 43).

Consistent with the findings in his report, Dr. Macvaugh testified that he believed that Dr. Goff made "two competing conclusions" in his evaluation of Simon: Simon is either malingering, or he has dissociative amnesia. (*Id*. at 44). Dr. Macvaugh stated that dissociative amnesia is an "amnestic disorder which is characterized by a complete or global amnesia for certain personal events, usually of a traumatic nature." (*Id*.). He testified that he did not find it to be a credible diagnosis, because he understood there to be no psychologically-based traumatic event associated with the onset of Simon's alleged amnesia as is generally required for the

51

diagnosis.  (*Id*.).

Dr. Macvaugh testified that six total malingering measures were administered to Simon between his evaluation and Dr. Goff's evaluation, and that Simon's scores fell within the range that is typically associated with malingering of memory and cognitive deficits in four out of the six instruments.  (*Id*. at 46-50).  Dr. Macvaugh testified that Simon's scores were not indicative of malingering on the Ray 15-Item Memory Test and the Miller Forensic Assessment of Symptoms Test ("M-Fast").  (*Id.*).  He noted, however, that Simon's results on the Ray 15-Item Memory Test were "on the border between good effort and feigning or poor effort," and that he did not attach "a whole lot of weight" to those results.  (*Id*. at 47-48).  Dr. Macvaugh stated  that Simon's results on the M-Fast were not indicative of malingering, but he noted that the M-Fast is designed to assess for malingering of psychiatric, rather than cognitive, symptoms.  (*Id.* at 49).

Dr. Macvaugh stated that Simon's performance on the Test of Memory Malingering, a more comprehensive malingering measure, were indicative of malingering, as Simon performed more poorly the more he was exposed to the stimulus, which is the opposite of what should occur with good effort.  (*Id*. at 48).  Dr. Macvaugh testified that on the fourth malingering measure administered to Simon, the Structured Inventory of Malingered Symptomatology, Simon's scores suggested that he was malingering memory and cognitive problems, but not psychiatric disease. (*Id.* at 49-50).

Dr. Macvaugh maintained that he knew of no evidence that would suggest that Simon lacks a rational understanding of the punishment he is facing.  (*Id*. at 51).  Dr. Macvaugh stated that during an "execution evaluation," it is important to make specific inquiries into an individual's understanding, such as:  "Why are they in prison?  Tell me. . . the events that led up

to being arrested.  Tell me where in the prison you reside.  What sentence are you facing?

What's going to happen?  Explain the finality of a death sentence."[20]  (*Id.* at 52).  He stated that

these inquiries were important to determine if the individual has a mental disease, and, if so, to

determine the extent to which the mental disease affects the individual's ability to have a factual

and rational understanding.  (*Id.*).  He testified that it does not appear that Dr. Goff posed similar

questions to Simon, and he noted that Dr. Goff did not mention the relevant legal standards in his

report or indicate that he attempted to assess Simon's competence for execution in any way.  (*Id.*

at 53).

Dr. Macvaugh noted that Simon did not necessarily attempt to malinger incompetency,

"as evidenced by his apparent willingness to answer certain questions related to that particular

concept."  (*Id.* at 62).  He testified that, for instance, Simon answered direct questions relating to

the punishment he is facing.  (*Id.* at 62-63).  He speculated that Simon might not have been "able

---

[20]  In *Billiot v. Epps*, 671 F. Supp. 2d 840 (S.D. Miss. 2009), the United States District
Court for the Southern District of Mississippi noted that the amicus brief filed by the American
Psychological Association, American Psychiatric Association, and the National Alliance on
Mental Illness in *Panetti* was recognized by the United States Supreme Court "as providing a
guideline for experts performing competency determinations."  *Id.* at 879-80.  The court noted
that the brief suggested the following:

> In the context of competency to be executed, the interview would begin with
> general, factual questions such as:  'Why are you in prison?" and "Why have you
> been sentenced to death"  After establishing the factual framework, the interview
> could be expected to address the examinee's rational understanding with
> questions like:  "Will you be executed?" and "What preparations have you made
> in anticipation of your execution?"  To the expert forensic psychologist or
> psychiatrist, the answers to these questions reveal the subject's mental capacities,
> and clarifying follow-up questions can probe ambiguous replies.  In addition, the
> clinician will consult collateral sources of information, including prison
> personnel, family members, and attorneys, as well as the individual's treatment
> records and mental health history.

*Id.* at 880 (citations omitted).

to connect the dots intellectually" and determine that questions relating to the relevant legal standards were also relevant to his clinical presentation. (*Id.* at 63). Dr. Macvaugh opined, however, that it is "fairly clear" that Simon possesses both a rational and a factual understanding of the punishment he is facing, and he testified that his opinions were "anchored" in the historical data contained in Simon's Parchman records about the statements Simon made prior to, during, and immediately following his stay of execution. (*Id.* at 54). Dr. Macvaugh noted that Simon used the term "execution" in his statements, Simon told a correctional officer that "he was playing a role" in attempting to avoid execution, and Simon's statements as recorded by his caseworker, Mary Cotton, demonstrate that Simon understood the punishment he was facing. (*Id.* at 54-55). Dr. Macvaugh stated that further evidence for his opinion is found in the fact that Simon's records contain an intercepted letter in which Simon states that he has to stop writing people in anticipation of something, and that while Simon did not articulate the reason he planned to stop writing, the letter was intercepted by Parchman postal inspectors at a time when Simon previously had an execution date set. (*Id*. at 56). Dr. Macvaugh testified that he did not find credible Simon's purported lack of awareness of his legal situation, noting that Townsend, Epps, and Cotton all reported and/or documented things Simon said about the execution that demonstrate his awareness of it. (*Id.* at 59). Dr. Macvaugh also testified that questioning made it apparent that Simon knows that a person dies when they are executed, and that the body is either burned up or it rots after death. (*Id.* at 58).

Dr. Macvaugh testified that there also exists "fairly strong data" to threaten the validity of Simon's claim of head injury and amnesia. (*Id*. at 56). Dr. Macvaugh stated that none of Simon's medical records substantiate that he received a head injury that could have been

responsible for the kind of amnestic functioning at issue in this case, and he also noted that Dr. Goff could not find a neuropsychological cause for Simon's behaviors. (*Id*. at 56-57). Dr. Macvaugh testified that he believed Dr. Goff's conclusion that Simon's clinical presentation had a "functional" component was just "another way of saying it's something a person does in order to achieve a certain outcome." (*Id*. at 57).

Dr. Macvaugh testified that he offered a diagnoses of Malingering and "Rule Out Antisocial Personality Disorder," because, while Simon displayed substantial traits of the personality disorder, he did not have enough data to give a definitive diagnosis. (*Id*. at 60-61). Dr. Macvaugh stated that Simon was sometimes uncooperative during his evaluation, but Dr. Macvaugh stated that Simon was unwilling, rather than incapable, of answering the questions. (*Id.* at 59). Dr. Macvaugh opined, "to a reasonable degree of psychological certainty, that Mr. Simon does not suffer from a major mental disease or defect that would significantly impair his ability to understand the punishment he is facing and the reason for it." (*Id*. at 61).

On cross-examination, Dr. Macvaugh iterated that Simon claimed he had no knowledge of the factual details of his crimes or the exact reason that he was on death row. (*Id*. at 66-69). Dr. Macvaugh stated that it was his belief, however, that Simon was capable of providing the information and simply was refusing to do so. (*Id.* at 70). Dr. Macvaugh stated that his conclusion that Simon is malingering amnesia is not directly addressing the issue of competence, though it is "an inference." (*Id.* at 72).

After a short recess, the Court posed specific questions to Dr. Macvaugh. Specifically, the Court noted that *Panetti* and *Ford* use affirmative language and inquired whether Dr. Macvaugh's conclusion that Simon "does not suffer from a major mental defect" that would

impair his understanding is a different standard. (*Id*. at 74-75). Dr. Macvaugh stated that it is his understanding that the law assumes competence "in the absence of major mental disease or defect," and that even when disease or defect is present, an individual's competence is not impaired "unless the symptoms of that illness clearly functionally impair that person's relevant abilities." (*Id*. at 75). He testified that he phrased his conclusion as such in order to avoid inserting himself in the role of fact-finder. (*Id*. at 75-76).

The Court also inquired whether, assuming that Simon has global amnesia, he has "the ability today to be told the crime he committed and the reason he's going to be punished" for it. (*Id*. at 76). Dr. Macvaugh stated he could not answer the question but noted that Simon appears to have the ability to learn new information, as evidenced by his ability to remember Dr. Macvaugh from his first to second visits. (*Id*. at 76-77). Dr. Macvaugh noted, for instance, that upon his second visit, Simon remembered that Dr. Macvaugh had been there previously, he remembered that he had gotten into trouble for the attempted assault and had lost privileges as a result, and he was able to recall that his lawyer met with him during the intervening months to encourage his cooperation with Dr. Macvaugh. (*Id.* at 77). Dr. Macvaugh stated that this suggested to him that Simon has both the capacity to remember information and the ability to apply it relevantly. (*Id.*).

The Court also asked Dr. Macvaugh to explain how he came to the conclusion that Simon's inability to recall how he came to be in prison was not truthful. (*Id.* at 78). Dr. Macvaugh stated that he came to that conclusion "within the context of all of the information" available. (*Id.* at 78-79). When the Court noted that Simon consistently stated "I not know" in response to questions about his arrest, trial, crimes, and sentence and inquired how those answers

could meet the requirement that Simon possess a rational and factual understanding of his punishment and the reasons for it, Dr. Macvaugh again stated that it is his opinion that Simon is unwilling, rather than incapable, of answering those questions. (*Id.* at 79-81).

The Court also inquired about Mississippi's statutory requirements for competency to be executed, and Dr. Macvaugh stated his opinion that Simon does not demonstrate a genuine impairment in his intellectual functioning that would preclude his ability to understand the nature of the proceedings against him; that Simon has the capacity to understand the nature of the proceedings against him, the purpose of his punishment, and the fate that awaits him; and that Simon has the capacity to know of any fact that might make his punishment unjust and relay that to his attorneys or the court. (*Id*. at 82-86).

Dr. Macvaugh stated that he understood Dr. Goff's report to offer two competing diagnoses, and that he could only speculate as to Dr. Goff's conclusions and recommendations. (*Id.* at 88-89). When asked to provide a clinical interpretation of what Dr. Goff might have meant when he suggested that a psychiatric evaluation of Simon might be helpful, Dr. Macvaugh speculated that Dr. Goff might have thought it beneficial to have a physician perform a series of tests performed to determine whether a medical condition, rather than a psychological condition, is the cause of the behavior displayed by Simon. (*Id*. at 89). Dr. Macvaugh testified that he did not think there would be benefit to such an evaluation, however, as Simon's medical records show no positive findings of an actual head injury. (*Id.* at 89-91).

In light of the Court's inquiries, counsel for Simon posed follow-up questions to Dr. Macvaugh. One series of questions related to Dr. Macvaugh's conclusion that Dr. Goff offered a definitive diagnosis of Malingering. (*Id*. at 93). Dr. Macvaugh testified that a clinician with

insufficient information to confirm a diagnosis would write "rule out" before the diagnostic impression, which Dr. Goff did not do. (*Id*. at 93-94). Counsel inquired whether Dr. Goff's statement that he could not determine whether Simon's "symptoms are intentionally produced versus subconsciously generated" is not essentially the same as "rule out" malingering, to which Dr. Macvaugh responded, "You'd have to ask Dr. Goff . . . I can't speak for what he meant by that." (*Id*. at 95).

### D. Request for Briefs

At the conclusion of Simon's evidentiary hearing, the Court noted that Simon had been examined by both the State and his own selected psychologist, and that he had been afforded a full hearing on his competency to be executed. (*Id.* at 100). The Court noted its concern that the evidence presented by Simon appeared to be sparse and asked the parties to identify any issues or facts in post-hearing briefs that might aid the Court's ultimate decision as to Simon's competency to be executed. (*Id*. at 99-100). In response to some of the Court's closing comments, counsel for Simon advised the Court that he might file a request to depose Mary Cotton. (*Id*. at 103). Respondents stated that they would object to any such request. (*Id.* at 104). The Court, noting that it had set aside sufficient time to provide the parties an opportunity to call all of their witnesses at the evidentiary hearing, advised the parties that it would have to consider whether to grant a post-hearing motion for a deposition. (*Id*. at 104). Simon's counsel made no subsequent request to depose Cotton, however, and the parties subsequently filed their post-hearing briefs. As the Court has already noted, it subsequently entered an order requiring supplemental briefing. The parties complied with the request, and the supplemental briefs were filed.

## VI. Discussion

Robert Simon, Jr., is competent to be executed if he rationally understands that he murdered several people, that he is to be executed, and that the crimes he committed are the reason he is to be executed. Unlike Alvin Ford and Scott Panetti, the petitioners in the cases that set the legal standard by which the instant case is resolved, Simon has no long and documented history of severe mental illness or delusional thinking through which his current experiences must be filtered in order to resolve questions as to his competency. *See, e.g., Ford*, 477 U.S. at 402-03; *Panetti*, 551 U.S. at 936. Rather, the Court must determine whether Simon possesses a factual and rational understanding of his legal situation, which is an assessment informed, though not conclusively resolved, by a determination of whether Simon is feigning his allegations of memory loss.

Dr. Macvaugh testified that he conducted his evaluation of Simon using an approved interview technique for competency determinations. He interviewed numerous sources, reviewed Simon's institutional records, and conducted psychological assessments as part of his evaluation of Simon. He concludes that Simon is malingering memory deficits. Simon's own expert, Dr. Goff, reported that Simon was either malingering memory deficits or, generously stated, that he could not rule out malingering as an explanation for Simon's behavior. These two experts administered a total of six malingering measures to Simon. Simon's scores were indicative of malingering on four out of the six tests, and his scores were indicative of malingering in four out of the five tests that were specifically designed to assess malingering of memory or cognitive issues.

The Court otherwise notes that Officer Townsend's affidavit, which states that Simon

reported he was "playing a role" to avoid execution, supports a determination that Simon is malingering. The Court also finds it significant that prison postal officials noted that a package addressed to Simon and containing a DSM-IV-TR arrived only days after Simon's petition for certiorari was denied by the United States Supreme Court, particularly in light of the fact that Simon was sending out letters two years before his alleged injury in January 2011 inviting others to intercede on his behalf due to his "mental condition." Therefore, the Court finds that significant evidence exists to suggest that Simon's purported memory loss is feigned.

Respondents argue that even if Simon's memory loss is genuine, it does not prevent his execution. In support of their argument, Respondents cite *Bedford v. Bobby,* where the Sixth Circuit found that "[t]he Supreme Court has never held, much less suggested, that the failure to recall precise facts of an offense amounts to the kind of incompetence that prohibits the execution of a defendant." *See Bedford*, 645 F.3d 372, 378-80 (6th Cir. 2011) ("Bedford has no documented prior history of a significant mental illness. And the evidence presented to the state courts at most suggests he does not recall a series of details about the murder or his life's history."). The Court agrees and finds that Simon's purported inability to recall that he committed several murders and was sentenced to death is, standing alone, insufficient to constitutionally restrict his death sentence. This conclusion does not resolve the inquiry before the Court, however, which is whether Simon's allegation of persistent memory loss interferes with his current understanding of his legal situation.

Simon argues that the evidence presented in this case demonstrates that he possesses, at most, an awareness of certain facts, such as the fact that a condemned inmate gets a last meal and the fact that people on death row are executed. He argues that this awareness, however, does not

translate into a rational understanding of his legal situation as is required by *Panetti*. Simon also maintains that Dr. Macvaugh's conclusions are expressed in the negative, and that concluding that there is no reason that Simon cannot understand his crimes and punishment does not meet the requirement that he actually have a rational understanding of them.

*Panetti* did not reject an "awareness" standard, but rather, it rejected a factual awareness standard that treated an impaired experience of reality as irrelevant to the competency inquiry. *Panetti*, 551 U.S. at 960; *Ferguson v. Secretary, Florida Dept. of Corrections*, 716 F.3d 1315, 1334-36 (11th Cir. 2013) ("[T]he Supreme Court in *Panetti* . . . clarified that the requisite 'awareness' or 'comprehension' required by *Ford* was tantamount to a 'rational understanding' of the connection between a prisoner's crimes and his execution."). At his evidentiary hearing, Simon presented only the testimony of his habeas attorneys in support of his claim. One of his attorneys, Forrest Jenkins, testified that she only met Simon once prior to the evidentiary hearing, and the Court finds that her observations of Simon have limited helpfulness in determining whether Simon is competent to be executed. More helpful to the Court is the testimony of Simon's lead habeas counsel, Tom Freeland, who represented Simon for over a decade by the time of Simon's alleged head injury in early 2011. Freeland testified that Simon did not understand his legal situation in 2011, and that subsequent communications with Simon have convinced Freeland that Simon does not understand his legal situation currently. The Court finds no lack of credibility in the testimony of Simon's counsel. It does, however, find that insufficient evidence exists to sufficiently corroborate their impressions that Simon appears to have a genuine impairment that would preclude his lawful execution under the relevant legal standards.

Since early 2011, Simon has denied a recollection of his crimes, his trial, his convictions,

or his death sentence, despite repeatedly being informed that he is on death row and the reason why he is there. He has consistently responded "I not know" to different questions of general knowledge or historical fact posed by various individuals. However, Simon's own expert opines that Simon's amnesia is not real and "there is nothing here which would suggest that he is unable to retain newly presented material or information." (ECF No. 51, 9). Moreover, Simon demonstrated a capacity for memory upon his second meeting with Dr. Macvaugh, when Simon acknowledged that Dr. Macvaugh had previously attempted to evaluate him; he knew what happened at the time of the attempted evaluation; and he remembered the resulting disciplinary actions that were taken by prison officials. Similarly, Mary Cotton's entries into Simon's "Offender Log" since his alleged head injury demonstrate that Simon was able to remember that he had an attorney, and that he knew how to contact his attorney. Her entries also demonstrate that Simon was able to recall his conversations with his attorney and with Dr. Goff, and he knew that Dr. Goff had some involvement in his case. Simon was able to accurately tell Dr. Macvaugh that inmate Gary Simmons was executed, and Simon recalled that Simmons had helped him with canteen orders and letter writing. Both Christopher Epps and Paul Pennington state that Simon recognized them upon sight. Therefore, the evidence suggests that Simon has the capacity to assimilate and recall information, and that his ability to understand that he has been convicted of several counts of capital murder and is sentenced to death is not impaired.

Additionally, as Dr. Macvaugh notes, Simon was able to have an explicit conversation about what he wanted for his last meal and what he wanted done with his remains. He made statements to Mary Cotton about the fact that he had been facing execution, and the fact that the State intended to "kill" him. Simon voiced an understanding that a person who is executed ceases

to live. The Court finds that these statements suggest Simon's factual and rational understanding of the punishment he is facing.

The Court finds Dr. Macvaugh's testimony in this case to be wholly credible, and he testified that Simon suffers from no mental disease or defect that would impair his abilities to factually and rationally understand his legal situation. While Simon has engaged in certain abnormal speech patterns and/or behaviors since his alleged fall and head injury in January 2011, the results of two separate expert evaluations suggest that he is feigning symptoms of amnesia. Simon's statements to prison officials, his case worker, and to Dr. Macvaugh suggest that he has the ability to learn and retain new information. There have been no positive findings that Simon suffered a traumatic brain injury. Simon has no documented history of mental illness or delusions, and his own expert stated that Simon does not have genuine amnesia. A review of the totality of the evidence before the Court convinces it that although Simon seems unwilling to acknowledge his crimes and death sentences, his purported memory loss does not prevent him from doing so. The Court concludes that Simon understands his crimes and punishment, and the connection between them. Accordingly, the instant petition will be denied.

## VII. Certificate of Appealability

Simon must obtain a certificate of appealability ("COA") before appealing this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Simon makes "a substantial showing of the denial of a constitutional right." 28 U. S. C. § 2253(c)(2). A petitioner makes such a showing "when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed

further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citation omitted); *see also*

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Court, resolving in Simon's favor any doubt as

to whether a COA should issue, determines that he is entitled to a COA on the question of his

competency to be executed.

## VIII. Conclusion

Simon is competent to be executed. Therefore, it is hereby **ORDERED** that all federal

habeas corpus relief requested by Simon is **DENIED**, and the instant petition shall be

**DISMISSED** with prejudice. It is **FURTHER ORDERED** that Simon is **ISSUED** a COA on the

question of whether he meets the *Ford/Panetti* standard for competence to execute. A final

judgment consistent with this Memorandum Opinion and Order will enter today.

**THIS** the 22nd day of December, 2014.

**/s/ Sharion Aycock**
**U.S. DISTRICT JUDGE**